1

2

3       IN THE CIRCUIT COURT FOR THE STATE OF OREGON

4           FOR THE COUNTY OF MULTNOMAH

5   **CEDAR LAKE HOMEOWNERS**
    **ASSOCIATION,** an Oregon domestic
6   nonprofit corporation; and **DECATUR**
    **BRIDGEWATER VISTA**                          Case No.
7   **CONDOMINIUMS OWNERS'**
    **ASSOCIATION,** an Oregon domestic            **DECLARATION OF NEILL FISHMAN**
8   nonprofit corporation,

9               Plaintiffs,

10  v.

11  **NORTHWEST EMPIRE**
    **COMMUNITY MANAGEMENT, INC.,**
12  fka Professional Community Management,
    Inc., an Oregon corporation,
13
                Defendant.
14

15      Neill Fishman declares as follows:

16      1.    I was the Treasurer of the plaintiff Decatur Bridgewater Vista Condominiums

17  Owners' Association ("Decatur Bridgewater") Board of Directors for the two years ending

18  September 24, 2012. I am currently serving as the Chair of the Board's Embezzlement Claim

19  Committee. Decatur Bridgewater is an Oregon nonprofit corporation. The Decatur Bridgewater

20  condominiums are located in Portland.

21      2.    On or about November 14, 2011, Decatur Bridgewater entered into a Management

22  Agreement with defendant. Attached as Exhibit 1 is a true copy of the agreement.

23      3.    On or about June 6, 2012, Decatur Bridgewater received an email from Greg Lloyd at

24  Northwest Empire Community Management, Inc. This email stated that Decatur Bridgewater's

25  funds had been "inappropriately allocated". A copy of the email is attached as Exhibit 2.

26

Page 1 -   DECLARATION OF NEILL FISHMAN

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*                                    *686965.13482-001*

1    4.    I understand and consent that a signed copy of this declaration that has been scanned

2  and sent to Decatur Bridgewater's counsel will be submitted to the court.

3        I hereby declare that the above statement is true to the best of my knowledge and belief,

4  and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

5        DATED this _9_ day of November, 2012.

6

7                                        _____
                                         Neill Fishman
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 2 -   DECLARATION OF NEILL FISHMAN
                    LANDYE BENNETT BLUMSTEIN LLP
                           Attorneys at Law

686965.13482-001

# CONDOMINIUM MANAGEMENT AGREEMENT
## ARTICLE I.    PRELIMINARY RECITA

A.    REAL PROPERTY COVERED BY THIS AGREEMENT

1. Condominium Name: Bridgewater Vista Condominium *Decatur av*

2. Address:  8712 N Decatur St. 101 - 505 Portland, OR 97203

3. Declaration Recording Date and Recording Number:

4. Bylaws Recording Date and Recording Number:

5. Declarant Name:

6. Total Number of Units: 29 Residential Units, 2⁰ Parking Spaces & 34 Storage Units

B.    ASSOCIATION OF BRIDGEWATER VISTA AS PARTY TO THIS AGREEMENT

1. Association Name:  AOU of Bridgewater Vista Condominium *Decatur Via*

2. Address:  8712 N Decatur St. 101 - 505 Portland, OR 97203

3. Type of Organization:  Non Profit Corporation, Home Owners Association

4. Federal Tax ID No.:

5. Corporation Registry No. (If applicable):

C.    MANAGING AGENT (PCM, Inc. – Professional Community Management, Inc.)
AS PARTY TO THIS AGREEMENT

1. Name:  PCM, Inc. – Professional Community Management, Inc. - Gregory Lloyd

2. Address:    PO Box 28205, Portland, OR 97228

3. Phone:    503-278-3231

4. Fax:    503-961-8796

5. E-mail:    gregory@pcmnw.com

Initial & Date

D.    DEFINITIONS

1. "Association" shall mean a corporation formed under the Oregon Nonprofit Corporation Act, or an unincorporated Oregon Association, its successors and assigns.

2. "Base Fee" shall mean the monthly fee as identified in Section 8(a), (b) and (c), and covers Agent's basic contractual services exclusive of all extraordinary services which may occur by Board direction and exclusive of those services identified in Section 9 and Exhibit A of this agreement.

3. "Board" or "Board of Directors" shall mean the Board of Directors of the Association, elected pursuant to the governing documents of the Association.

4. "Budget" shall mean a written, itemized estimate of the expenses to be incurred by the Association in performing its functions under its Declaration and/or Bylaws.

5. "Common Area" shall mean all the real property and improvements, including without limitation, streets, open parking areas, landscape areas and recreational facilities, which are owned or controlled by the Association for the common use and enjoyment of all the owners.

6. "Governing Documents" shall mean the Declaration of the Condominium, and other documents, such as Bylaws of the Association, which govern the operation of the Condominium.

7. "Maintenance Assessments" shall mean those rates established and approved by the Board of Directors, which the Association members are bound to pay as their share of the common expenses and reserves. The term "Association" as used herein shall mean an association consisting of all the Owners of units in the Condominium organized under the laws of the State of Oregon for the purpose of administering the Condominium established by the Declaration for the real property.

E.    MISCELLANEOUS

In consideration of the covenants herein, the Association as described in B above enters into this Agreement with the Agent to manage the property described in A above for the compensation provided in Section 8 and for the term as set forth in Section 11 and subject to the Retainer Agreement, "Scope Of Services", Terms and Conditions set forth hereafter and made a part of this agreement. These documents are to be construed as one integrated written agreement between the parties, and include the recitals.

This written Agreement supersedes any and all prior representations, understandings and communications, and may be modified only by written agreement of the parties. Any oral agreements or modifications are expressly invalid. This written Agreement is to remain confidential between the Board and Agent, including after any termination of agreement.

_DOE 11-14-10_
Initial & Date

_asw 11/14/10_

EXHIBIT    1
Exhibit B Page 4 of 21
PAGE  4  OF 70

This Agreement shall be construed in accordance with, and governed by, the laws of the State of Oregon. If any term, provision, covenant or condition of this agreement, including the Scope of Services, should be found by a Court of competent jurisdiction to be invalid, all other provisions shall continue in full force and effect, and shall in no way be affected, impaired or invalidated. If any legal proceeding is necessary to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to its reasonable attorney's fees and legal costs, in addition to any other relief to which such party may be entitled. The parties agree that this agreement shall be effective as of the date set forth in the TERM OF CONTRACT. (Section 11)

If the Association is incorporated, it is understood and so assured by the signer that the person signing on behalf of the Association is a duly elected officer thereof, and has corporate authority to execute contracts. If Association is unincorporated, and this agreement is signed by both parties prior to the first (organizational) meeting of unit owners, it is understood and assured by the person signing on behalf of Association that the Association automatically assumes or will assume the full legal obligations of this Agreement for the full term stated in this Agreement, and that no provisions to the contrary are or will be included in the Governing Documents.

## ARTICLE II: "SCOPE OF SERVICES" APPOINTMENT AND ACCEPTANCE

The Association hereby exclusively employs the Agent, and appoints the Agent to manage the Association under the sole direction of the Board of Directors upon the terms and conditions hereinafter set forth. The relationship between the Association and Agent is one of Principal and Agent.

The Managing Agent (hereinafter called "Agent") shall deliver services reasonably necessary to provide Association with management services on behalf of the Association's Board of Directors, and strictly within the scope of this Agreement.

### 1. MANAGING AGENT'S SERVICES AND RESPONSIBILITIES

1.1    The Association hereby appoints the Agent and the Agent hereby accepts appointment, on the terms and conditions hereinafter provided, as the Agent for the Association.

1.2    The Association retains the primary responsibility for enforcement of provisions of the Association's governing documents and contractual agreements and assumes liability for any and all acts and occurrences which relate to the actions of the Association, and its actions concerning the real property covered by this contract.

1.3    Agent shall undertake reasonable efforts to implement the lawful decisions of the Board of Directors and in accordance with the Terms and Conditions of this agreement, subject to the compensation schedule set forth herein. Agent shall not be obligated to implement any decision which:

_(signatures)_ 11/14/10

Initial & Date

EXHIBIT 1
Exhibit B Page 5 of 21
PAGE ___ OF ___

a)    is c   ary to the terms of this Agreement, applicable laws  Governing Documents,

b)    would involve transactions or services outside the Agent's expertise, knowledge or licenses,

c)    would involve transactions or services which are not set forth in this Agreement.

1.4    It shall be the responsibility of Agent, during the term of this Agreement, to perform the duties as set forth in this Agreement, consistent with the plans and directives of the Association's Board of Directors, and to perform such other acts as are reasonably necessary to discharge Agent's responsibilities.

## 2.    FINANCIAL MANAGEMENT

2.1    Maintenance Assessments. The Agent shall provide for the collection and deposit of all maintenance assessments at intervals as set by the Board of Directors and agreed to by Agent. Agent shall establish a separate checking account or accounts, with, at its sole discretion, any federally insured institution(s), as is customary with other Associations managed by Agent for the deposit of Association's operating funds. Agent is authorized to provide information to owners' escrow and mortgage companies regarding assessment account status and to charge reasonable processing and administrative set-up fees.

2.2    Association Operating Funds. Agent shall establish and maintain Association funds, in a bank of Agent's choice, whose deposits are federally insured and in a manner to indicate the custodial nature thereof, a separate bank account as Agent of Association for the deposit of monies of Association, with authority to draw thereon for any payments to be made by the Agent to discharge any liabilities or obligations incurred pursuant to this agreement and for the payment of the Agent's fee, all of which payments are subject to the limitations of this agreement. From funds collected, Agent shall cause to be paid the expenses for the operation of Association in accordance with the approved budget or as otherwise authorized by Association's Board of Directors. Any service fees charged for banking services or account maintenance by the bank shall be the responsibility of the Association, and shall be a charge against Association's operating and/or money market accounts. The President, Secretary/Treasurer of the Board of Directors will not have authority to sign checks, only the Agent shall have the authority to sign checks from the operating and reserve account on behalf of the association.

_Ann 11/19/10_

_CME 11-14-10_
Initial & Date

EXHIBIT 1
Exhibit B Page 6 of 21
PAGE 2 OF 10

2.3    Delinquent Accounts. Agent is authorized to take reasonable steps for collection of delinquent accounts. In the event such efforts fail, Agent shall have the authority to record a lien against the delinquent owner's unit in accordance with the Governing Documents, state of Oregon statutes, and the approved collection policy. The Agent is authorized to assess the delinquent account a late charge and a delinquent processing charge, along with other charges for collection, lien and late notice fees, reflective of the costs of collection, accounting, payment plan monitoring and legal proceedings. Agent shall be paid 50% of any late charges billed to accounts. Statutory interest may be charged commencing 30 days after any due date. Reasonable costs of collection, including attorney's fees, are authorized to be charged and collected per Exhibit A.

2.4    Disbursement Authorization. Agent is authorized and shall make all disbursements from Association funds for liabilities incurred on behalf of Association. Association acknowledges Agent's role as Paymaster. Accordingly, such disbursements may be made via paper drafts or electronically at the discretion of Agent. Agent is authorized to utilize all fraud control systems and methods available to Agent for the protection of Association's funds. Agent is hereby granted authority to make any reasonable, non-budget expenditure as provided in this section at its own discretion up to $5500.00 in any fiscal month. In addition, Agent shall have the authority to make normal and usual expenditures, as prescribed by the Board of Directors and by the Association's approved operating Budget. Agent shall use best efforts to try to obtain approval for any extraordinary expenses of the Association, in advance, as needed.

Emergency repairs involving imminent danger to life or property, or immediately necessary for the preservation and safety of the property, or for the safety of the Members, or required to avoid the suspension of any necessary service to the complex, may be made by the Agent irrespective of the cost limitation imposed by this section.

Agent shall establish Association's reserve accounts at Association's direction. Agent makes no warranty or representations regarding the security or yield of any reserve investment. Except for the disbursements provided for above, all reserve account disbursements will be signed by two members of the Board of Directors, unless the Agent is authorized in writing by two (2) members of the Board of Directors to sign for such disbursement from a reserve account.

2.5    Accounting and Financial Statements. Agent shall maintain a set of accounting records in accordance with generally accepted accounting principles.

a)    Agent shall distribute monthly to all members of the Board of Directors a financial statement for the previous month, including copies of the Balance Sheet, Statement of Income and Expenses, Schedules of Cash Investments, reserve allocations, and a check register of disbursements.

b)    Agent shall reconcile all bank statements and shall provide to the Board

Initial & Date

EXHIBIT 1
Exhibit B Page 7 of 21
PAGE 5 OF

copies of both statements and reconciliations.

c) Agent shall cooperate with auditors in their performance of audits and reviews of Association's records and their preparation of applicable tax returns in accordance with Exhibit A.

d) Agent shall, upon direction from the Board of Directors, distribute to all members, at Association expense, copies of annual financial reports, budgets, collection policies, and all other publications and reports deemed necessary by the Board of Directors and applicable laws.

2.6    Budget Preparation. Agent shall prepare and submit to the Board of Directors a proposed budget. Any budget draft will be subject to final approval by the Board of Directors and the Board shall retain full responsibility for the appropriateness of data contained in the budget. Agent shall use its best efforts to prepare such proposed budget in compliance with any statutes. Any decision to adopt Agent's proposed budget or reserve analysis, or to amend it will be reserved to and exercised solely by the Association's Board of Directors.

2.7    In the event the Association elects to have an outside firm perform a reserve study, Agent agrees to cooperate with said outside firm and to furnish any and all necessary forms and documents in Agent's possession, upon request. Agent shall be compensated in accordance with Exhibit A for this consultation.

2.8    All postage and supplies associated with this Agreement will be at the expense of the Association and reimbursed to the Agent under conditions of Section 8 hereinafter.

3.    PHYSICAL MANAGEMENT

3.1    Maintenance. Agent shall assist the Board of Directors in its responsibilities for the upkeep, maintenance and management of Common Areas and the equipment, pursuant to the Association's documents and within the scope of this agreement.

3.2    Agent shall receive maintenance requests and/or complaints concerning Association's Common Areas, and communicate them to the Board of Directors, or if so directed by the Board, to the appropriate contractors and vendors for correction, repairs or maintenance.

3.3    Agent shall provide a 24-hours per day, 7 days per week call center to assist or refer emergencies in the Common Areas of the Association. Serious matters will be reported to the Association's Board of Directors with appropriate recommendations for the purpose of receiving further instructions from the Board on how to proceed. Agent shall receive and/or assist calls after normal working hours. Agent shall be entitled to a fee for after-hours calls requiring an immediate response in excess of two (2) calls per month, in accordance with Exhibit A. Onsite visits necessitated, at discretion of Agent, by such calls, shall be charged at the hourly

*Initial & Date*

EXHIBIT   1
Exhibit B, Page 8 of 21
PAGE ___ OF ___

rate noted for Manager's Extra Time, portal to portal.

3.4     Agent shall perform a minimum of once monthly general reviews of the Common Areas and facilities from ground level, and will submit findings, action taken and recommendations to the Board of Directors, to assist in preserving the aesthetics of the Common Areas. The Agent shall not be required to review the Common Areas during its walk-through's from any other perspective than from ground level. Agent is authorized to initiate routine repairs to the Common Areas and facilities, so long as such repairs and maintenance are in compliance with the Board's adopted management plan for the Association, or Section 2.4 herein.

3.5     Bids for Hiring, Supervising and Discharging Third Party Contractors.

a)     Agent shall, upon receipt of instructions or upon resolution of the Board of Directors, request bids from insured vendors of Agent's and Board's selection, with a minimum of two (2) and a maximum of three (3) bids for the types of third party goods or services that Agent believes, in his sole discretion, are likely to cost $5,500.00 or more. Those items for which the Board requests bids that are in the Agent's sole discretion likely to less than $5,500.00 will not be let out for bid, and Agent shall be under no duty to solicit bids for those items. Should the Board wish for Agent to solicit bids for an item costing less than $5,500.00, Agent shall be entitled to an hourly fee in accordance with Section 9.1 of this agreement. Specifications for all items shall be included with the Board's request, and the Board shall be solely responsible for establishing the standards, specifications or criteria for work to be let out for bid. Agent will endeavor to make helpful suggestions; however, the final decision in establishing standards, specifications and criteria shall be the Association Board's.

b)     Agent shall, upon receipt of the Board's written instructions or resolution, discharge contractors that the Board decides are not performing up to the standards, specifications or criteria established by the Board of Directors. Agent, on the basis of an operation schedule, job standards and compensation rates approved by the Association shall investigate, secure and pay third parties in order to maintain and operate the Association. Any contract for such third party contractors will be a direct contract between the Association and the third party contractor, and Agent shall act solely as the Agent of the Association in negotiations and maintenance of said contract, and not as a contracting party. Compensation for the services of all third party contractors shall be paid by the Association. Agent shall have no authority to sign any contract on behalf of Association unless the Board of Directors has granted such authorization to Agent in writing.

3.6     Agent is authorized to install a key lockbox in a location mutually agreed upon

VKE 11-14-10
Initial & Date
_____ 11/14/10

between Association and Agent.

## 1.    ADMINISTRATIVE MANAGEMENT AND CONSULTING

4.1    Agent shall organize the records and documents it receives from the Association or their prior manager or management company in accordance with its normal procedures. Within sixty (60) days from receipt of complete records, Agent shall render financial statements in their usual form showing the financial status of Association, or, if the records are inadequate to prepare such financial statements, Agent shall submit a written recommendation to Association. If such recommendation suggests a review or audit by a third party, or additional investigation and organization of information that will permit the publication of financial statements, Agent shall provide estimated cost of performing such services.

4.2    Agent shall write letters and communicate as necessary to assist the Board in carrying out its responsibilities, and will receive and write letters to unit owners and others concerning violations of Association documents and rules, unit owner's requests, architectural and maintenance matters, etc.

4.3    Agent shall counsel and advise Board of Directors and its committees in their day-to-day operations.

4.4    Agent shall assist in interpretation of the rules of the Association and suggest alternative steps of enforcement.

4.5    Agent shall provide, at Association's sole cost and expense, material and expertise in the development of methods of communication to the unit owners (rules and regulations, etc.), as necessary.

4.6    Meeting Notices. At the request of the Board, and at the Association's sole cost and expense, Agent shall send notices of Association meetings, prepare the Agenda for said meeting, circulate minutes of any such meetings as prepared by the Secretary, and effect instructions as approved by the Board of Directors.

4.7    At the Association's sole cost and expense, Agent shall assist in preparation for Association Annual Membership Meeting, including notices, proxies and agenda, if so requested by the Board of Directors.

4.8    Agent shall not be responsible to record and/or type minutes of regular meetings of the Board of Directors or the Annual Meeting of the Association. Upon request by the Board of Directors, Agent shall coordinate a third party to serve as recording secretary, the costs for which shall be borne by the Association.

4.9    Association Records. Agent shall maintain possession of all records, with the

Initial & Date

exception of correspondences, on the affairs of the Association throughout the term of this Agreement. Agent shall maintain possession of correspondences for a [        ] ed period of six years from the date received by Agent. While Agent shall put forth every effort to maintain Association records in good order, Agent makes no representation or warranty as to the accuracy and/or completeness of such records. Accuracy and/or completeness of the Association records remain the responsibility of the Association.

4.10    Review of Records. During the term of this Agreement, Agent shall make available for review by the Board all records in Agent's possession that pertain to the Condominium, with the exception of correspondences. Correspondences pertaining to the Condominium shall only be held by Agent for a period of six years from the date received by Agent, after which time such correspondences shall not be retained by Agent. Association agrees that Agent shall charge a fee in accordance with Exhibit A for records research and for the scheduling and monitoring of such a review.

4.11    Special Mailings and newsletters requested by the Board, as prepared by the Association and Agent, shall be prepared, duplicated and mailed at the expense of the Association. All requests for duplication of additional copies of project documents, correspondence, reports, etc., will be at the expense of the Association.

4.12    Agent shall not be responsible for any contractor, subcontractor or Association employee's work performance or adherence to specifications or schedules.

4.13    Agent shall attend one Home Owner Association meeting per year. Agent shall attend one board meeting per quarter (every three months) a total of 4 meetings a year. Meeting selection shall be at the direction of the Association.

5.    TERMINATION OF AGREEMENT

5.1    Termination. Either party may terminate this agreement by providing sixty (60) days written notice to the other. This termination provision may be invoked with or without cause. Upon such notice of termination, both parties agree that this Agreement shall remain in full force and effect for the entire sixty (60) days.

5.2    Arbitration Provision. In the event of a dispute over the performance and/or non-performance by - either party in this agreement, the alleging party shall offer arbitration to the offending party prior to initiating legal action to gain compliance with the terms and conditions set forth by this agreement.

Prior to requesting arbitration, the alleging party must provide the offending party written notice of the dispute. Such notice shall allow for a reasonable time, not to exceed thirty (30) days, for the offending party to comply with this Agreement. After the expiration of said thirty days, the alleging party can proceed to binding arbitration. Upon acceptance of a written demand

Initial & Date

for arbitration, the dispute shall be submitted to arbitration with a single arbitrator mutually selected by the parties fr a list of five arbitrators submitted by the A ican Arbitration Association. The determination of the arbitrator shall be binding upon both parties. The arbitration shall be conducted pursuant to the rules of the American Arbitration Association and shall be submitted within 120 days of submission. Upon making a written demand for arbitration, the dispute shall be submitted promptly to an arbitrator mutually selected by the parties and the determination of the arbitrator shall be binding upon both parties. If the arbitrator shall determine that offending party has committed a material breach of this Agreement, then such finding shall furnish the aggrieved party with the right to terminate the contract 30 days after the final decision of the arbitrator. In the event that the parties cannot mutually select a single arbitrator, the arbitrator will be selected by the American Arbitration Association from the remaining names.

    5.3    Termination Fee. Each party shall be responsible for any costs they incur in the termination of this agreement. Agent will be paid a termination fee of not more than $35 and be reimbursed for all duplication costs and transition materials including boxes, files, postage and any delivery costs.

    5.4    Condemnation. Upon taking of the entire or a substantial portion of the Project through lawful condemnation proceedings by any governmental party, either party may terminate this agreement by serving 30 days written notice by certified mail to the other party.

    6.    RECORD RETENTION

    6.1    The Association's current records shall be kept at the Agent's office. Such records shall be available for inspection and copying during Agent's normal business hours in accordance with Oregon state laws and the Governing Documents, Monday through Friday. Agent shall be entitled to charge and receive copying and document research costs, as set forth in Exhibit A, from anyone requesting copies of records or documents, before making such copies. Agent shall be entitled to reasonable notice prior to such inspection or copying of records.

    6.2    Unit Owners Lists. Agent shall maintain a current list of unit owners in the Association in accordance with the information supplied to Agent. Reasonable efforts will be made to keep this list accurate, but it shall be the responsibility of the Association to advise Agent of address or ownership changes of which it becomes aware. Agent shall not be obligated to search official records or other record sources for such transfers of ownership unless specifically requested to do so by the Board at hourly rates set forth in this agreement. Agent will record changes of address of ownership upon advice from owners, with supporting documentation.

    6.3    Correspondence. Agent shall maintain documents and complete files for all current correspondences relating to Association, such as incoming unit owner correspondence, violation and architectural control letters, contracts, purchase orders, filing with public agencies, insurance policies and information and other related documents. Correspondences shall only be

_UNEllrM-LO_
Initial & Date

retained by the Agent for six (6) years from the date received, after which such correspondences may be disposed of by Agent. Agent shall only retain electronic copies of correspondences.

6.4    All records and correspondence regarding Association are and will remain the sole property of Association. Agent agrees to return any and all such records and correspondence to the Association, or to an entity or person designated in writing by the Board of Directors upon termination of this Agreement. Such records shall be available for pick up at Agent's office or such other designated location as may be agreed upon. Electronic media, such as computer tape, discs, and general electronically stored databases are the sole property of the Agent. However, Agent shall provide Association with a hard copy of all such records, as requested, at the sole cost and expense of the Association per Exhibit A.

6.5    Agent agrees to maintain storage of Association records and correspondence at the sole cost and expense of the Association per Exhibit A.

7.    INSURANCE AND INDEMNIFICATION

AGENT'S INSURANCE

7.1    Agent shall, throughout the term of this Agreement, and at Agent's expense, maintain the following insurance coverage:

a)    Fidelity bond or employee dishonesty insurance will be provided for all Agent's employees, when applicable, to protect Association funds.

b)    Agent's liability insurance and comprehensive general liability coverage, including automobile liability, completed operations, blanket contractual and personal injury coverage, with combined single limits of $1,000,000 property damage and liability.

c)    Workers Compensation Insurance in the statutory amount, covering any of Agents employees.

ASSOCIATION INSURANCE

7.2    Association shall maintain at its sole expense a policy of comprehensive general liability, Directors and Officers, worker's compensation and property insurance (as necessary) in accordance with the Governing Documents and applicable Oregon State codes.

7.3    Association shall name Agent as an additional named insured on the Association's policies of comprehensive general liability and said insurance policies shall cover Agent for any and all claims and losses indemnified by Association pursuant to Section 7.7. Agent shall be provided with insurance certificates identifying Agent as additional insured showing the amount

Initial & Date

of coverage to be furnished to the Agent.

7.4    In the mutual interest of Association and Agent, both parties agree that fidelity insurance coverage protecting Association funds shall be a Master Fidelity policy, so long as such coverage is available. The limits of the Master Fidelity policy shall be no less than the total amount of the Association's reserve funds plus three (3) months total assessment income.

7.5    In the event the Association fails to maintain agreed upon insurances, Agent may unilaterally terminate this Agreement immediately, and the provisions of Section 5.1 above shall not be applicable to Agent's action.

7.6    Agent shall maintain reasonable communication with Association's insurance agent and will assist the Board in reviewing and renewing insurance coverage, including solicitation of bids for such coverage. The Board of Directors is solely responsible for maintaining insurance coverage for the Association, and for adequacy of coverage.

INDEMNIFICATION
7.7    Association shall indemnify, defend, and hold harmless Agent and its employees, agents, officers and directors from and against any and all claims, demands, losses, costs, expenses, obligations, liabilities, judgments, orders and damages, including interest, penalties and attorney's fees, that Agent shall incur or suffer, which arise, result from or relate to the performance by Agent of its duties under this Agreement in good faith and in the ordinary course of business, except for the willful misconduct or gross negligence of Agent This includes, without limitation and, for example, a situation in which Agent is made a party to litigation, arbitration or other proceeding brought by a unit owner, a Member, a contract vendor of the Association, or an outside party by reason of Agent's position as Agent or its activities hereunder. This provision shall survive any termination of this Agreement.

7.8    Agent shall only be responsible for the willful misconduct or gross negligence where such liability is due to the sole conduct of Agent and/or its employees in its performance of its duties under this Agreement.

8.    COMPENSATION - ENHANCED MANAGEMENT SERVICE

In consideration of Agent's acceptance of its appointment hereunder and the performance of services as set forth herein, the compensation to which the Agent shall be entitled will consist of fees for basic services (Base Fee) which are considered due upon execution of this Agreement, but are paid monthly, along with those fees and costs for special or extraordinary services as set forth in Exhibit A.

a)    Agent shall be paid in advance on the first day of each month without prior

*(KME 11-14-10)*
Initial & Date

*(signature) 11/19/10*

EXHIBIT    1
Exhibit B Page 14 of 21
PAGE ___ OF ___

Association approval. The total monthly base fee is $522.00, based on a total of 29 unit. Total monthly base fee will remain at $522.00 for a period of 1 year from date of contract signing, as long as contract remain in effect and is not cancelled by either party.

b)  The base fee, as defined, shall be net to Agent and is exclusive of the Association's operating expenses and costs. The base fee shall be superseded by the adoption of a new annual association budget indicating an adjusted base fee for management services. Adoption of the annual budget by the Association's Board of Directors shall constitute an approval of a base fee change under this Agreement, but in no event shall the base fee be less than the amount stated in paragraph (a) of this section.

c)  Agent and Association agree that the base fee for services identified in paragraph (a) above, is based upon 6 hours per month being necessary to fulfill Agent's duties defined by this Agreement. Hours are proportionate to number of units, which have closed escrow through completion of Declarant sales program. Association and Agent agree that if monthly time is in excess of these hours in the aggregate, the provisions of Section 9.1 may apply. Agent shall notify Association before going beyond specified hours, and will receive authorization in writing or email prior to exceeding prescribed hours, except as outlined in Paragraph 8(d) below.

d)  In the event that an emergency occurs, and Agent reasonably believes that responding to the emergency would cause Agent to exceed the prescribed hours, Agent will make all reasonable efforts, given the circumstances, to notify Association and receive authorization to proceed.  However, Association's lack of timely response shall not prevent Agent from responding to protect Association in a reasonable manner.

8.1  Agent's Fees and Costs. Any base fees and costs due the Agent will be paid promptly each month on the first of each month. Any monies due and billed and not paid to Agent by the fifteenth (15th) of each month will carry a 1.5% per month late fee which will be added to the balance due and will be subject to further late charges until paid. Interest at the maximum legal rate to be charged thirty (30) days after any amounts are delinquent.

8.2  Reimbursable Administrative Operating Expenses. The Association shall reimburse Agent for all postage costs incurred by Agent on Association's behalf. In addition, Association will reimburse Agent for all reasonable expenses incurred on behalf of the Association including, but not limited to, those expenses listed in Exhibit A attached hereto, as may be amended from time to time, and included herein. Said costs will be reimbursed on a monthly basis as incurred and billed.

Initial & Date

EXHIBIT 1
Exhibit B Page 15 of 21

8.3    Deduction of Agent's Compensation. Association shall be obligated to pay, and Agent shall receive as compensation for its services under this Agreement the sum provided for in this section herein and above at the times therein set forth. Agent is entitled to deduct such compensation when due from the funds then in its possession. Agent's compensation covers normal and usual administration expenses of Agent required by actions of the Board of Directors.

## 9.    SPECIAL OR EXTRAORDINARY SERVICES

9.1    Association shall pay Agent compensation in accordance with Exhibit A for services performed on behalf of Association outside the normal course of operation or outside the parameters of this agreement. These items shall include, but not be limited to, hours spent in oversight or management of work directly related to construction defect claims and/or time specifically expended in oversight or management of major reconstruction project(s).

9.2    Agent may be required to perform additional services beyond the scope of these services, for which the above fees, or the current rates that are then applicable, will be charged by the work performed. Examples of such services are, but not limited to:

a)    Assistance in adhering to requirements of laws and regulations, which may be passed during the term of the Agreement that requires Agent participation.

b)    Agent shall be paid per hour, at the Manager's rate as shown in Exhibit A, portal to portal, for work performed by Agent on behalf of Association, including but not limited to, appearance at court, at hearings, depositions, claims negotiations and processing of insurance losses or reconstruction, performing committee functions, such as monitoring, reporting and updating of any architectural progress, development status reports, bank loans, investments, maintenance, construction defect matters, financial reconstruction, discovery on Association's acts prior to the original commencement date of this Agreement.

Agent shall only be paid for the services identified above if performing said services cannot be accomplished, along with Agent's other duties defined herein, within the hours prescribed by Section 8, paragraph (c) of this Agreement.

c)    If requested by Board to attend meeting, Agent shall be paid per hour, at the Manager's rate, for attendance at Board or annual meetings, minimum of one (1) hour, and in half-hour increments thereafter. Portal-to-portal time will apply if meeting location is greater than 20 miles from Agent's main office.

Initial & Date

10.    ASSOC    TION SET-UP FEE

10.1    Agent shall be paid a one-time, non-refundable fee of $10.00 per unit a total of $290.00, payable with the first month's fee, at the commencement of this Agreement to offset the costs of setting up the Association's records. Not included in such set-up fee are bank charges or Board authorized independent accountant fees, which may also be incurred.

11.    TERM OF CONTRACT

11.1    Commencement Date. After execution of this contract by the Association's Board of Directors, Agent's compensation shall commence upon the day indicated in the following paragraph.

11.2    This Agreement shall commence upon first close and shall continue in full force and effect for twelve months, and thereafter from year to year. This Agreement shall automatically renew for a like term at each anniversary of the commencement date, subject to the termination provisions contained in this Agreement.

12.    AGENT AND ASSOCIATION PROTECTION

12.1    Agent Employees. Agent spends significant amounts of time and money to hire and train employees for the operation of this and other Associations. Association derives and benefits from Agent's experience in managing, and their hiring and training procedures. Association agrees it will not hire, retain, or contract with any employee, partner, officer, or co-owner of agent or its parent company or divisions in any capacity whatsoever for a period of six (6) months following the termination of this Agreement or any extension thereof. Association agrees to pay Agent the sum of Ten Thousand Dollars ($10,000.00) as liquidated damages if it breaches this provision of the Agreement. Both parties agree that this is a reasonable sum due to the extensive training and trade secrets that Agent provides, as well as expectation of continued income and allotment of resources, and further with respect to the difficulty in establishing the amount of actual damages.

12.2    Association shall have access to and be dealing with trade secrets of Agent, such are confidential information pertaining to client lists; procedures, processes and documentation relating to management of Agent's client Associations; and programs, software, procedures and techniques relating to data processing and financial reporting. Association agrees to hold any such trade secrets or confidential information, attained during the course of this Agreement, in the strictest confidence, and shall retain a total confidentiality, giving value to protecting them from Agent's competitors. This provision shall survive termination of this Agreement.

12.3    All materials of a confidential nature, prepared and utilized in Agent's

_LANE U-bY10_
Initial & Date

_Que 1/14/10_

performance of their duties un—— this Agreement, shall remain the exclusive property of Agent, and shall be retained in   nt's possession.

13.    MISCELLANEOUS

13.1    Advances and Charges. Agent shall not be required to, perform any act or duty hereunder involving the expenditure of money unless Agent shall have in its possession sufficient funds of the Association available. Therefore, if at any time the funds in the possession of Agent are not sufficient to pay the charges incident to this Agreement, Agent, shall not be responsible to advance its own funds for any reason, and the Association agrees, in such cases, that upon notice thereof by Agent, the Association shall make immediate arrangements to make funds available to cover the insufficiency.

13.2    Agent shall receive communications and directions from any Association director, and shall act with the assumption that said director is acting on behalf of the entire Board. However, should a conflict arise between directors, Agent shall consider the President as the representative of the Association with authority to act on behalf of Association. Should the President be unavailable to resolve such a conflict, then the Secretary shall serve in this capacity. Agent may, but is not required to, submit any matter, direction, instruction or the like to the Board of Directors and shall then follow the direction of the Board of Directors.

The Association Board of Directors understands its fiduciary duties, and agrees to govern the Association in a business like manner, acting in good faith and in the best interest of the Association and will work to adopt a business management plan for the future of the Association.

13.3    Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the successors and assigns of the Association. This Agency agreement shall be binding on the parties hereto, their heirs, executors, administrators, successors and assignees, and constitutes the full agreement except that subsequent changes or additional provisions must be in writing and executed by both parties.

Notwithstanding the preceding sentence, the Agent shall not assign its interest under this Agreement except in connection with the sale of all or substantially all of the assets of its management business. In the event of such a sale, Agent shall be released from all liability by the Association.

13.4    Association and Agent acknowledge that they have carefully read and reviewed this agreement and each term and provision contained herein including any addendums or additions such as "Summary of Fees – Exhibit A" and by execution of this Agreement show their informed and voluntary consent thereto. The parties hereby agree that, at the time this Agreement is executed, the terms of this Agreement are commercially reasonable and effectuate the intent and purposes of the Association and Agent with respect to the service agreement.

Initial & Date

14.   DISCLAIMER

No representation or recommendation is made by the Agent or its employees as to the legal sufficiency, legal effect, or other consequences of this Agreement. The parties shall rely solely upon the advice of their own legal counsel as to the legal and other consequences of this Agreement.

By affixing signatures below, both Association and Management Agent agree to the terms, conditions and provisions specified by this Agreement.

~~AGENT:~~ *Assoc Mgmt.*

ASSOCIATION

By: _____        By: _____
*Matthew Weston*                         *LISA ANN ENGEL*
Title: *President*                  Title: *TREASURER*
Date: *11/14/10*                    Date: *11-14-10*

*Agent:*

*Greg Lead*

*Senior Asset Manager*

*11/14 / 2010*

_____
Initial & Date

EXHIBIT ___1___

Exhibit B Page 19 of 21

| | |
|---|---|
| Replacement of Common Area Access Cards and/or Keys | $15.00 |
| New Home Owner Setup Fee (New Buyer) | $65.00 |
| Mortgage Application Fee<br>(Includes condo cert, budget, financial statements & 12 months of minutes) -<br>*In the event the transaction does not close the fee will not be collected.* | $65.00 |
| Escrow Administration - *In the event the transaction does not close we will not collect the fee.* | $65.00 |
| Additional or Replacement Copies of Director's Manual<br>(Email Copies or Copies Via the Association's Website are Free) | $25 + Postage |
| After Hours Emergency Calls (If issue is not HOA Related) | $35.00 |
| After Hours Emergency Onsite Presence (If issues is not HOA related) | $75 Per Hour |

*Any other services or activities will be*
*charged at cost of materials plus $75 per hour*
**\*\*Costs of the above services may be subject to change**

UATE 11-14-00

_____
INITIAL & DATE

Professional Community Management, Inc.
www.pcmnw.com ○ 503-276-3231 | PO Box 20205 | Portland | OR | 97226

EXHIBIT
Exhibit B Page 20 of 21

**Crane, Jim**

| | |
|---|---|
| **From:** | Cohen, Stuart |
| **Sent:** | Wednesday, November 07, 2012 8:34 AM |
| **To:** | Crane, Jim |
| **Subject:** | FW: HOA Funds |

Admission e-mail. Greg Lloyd is one of the owners of NW Empire

**From:** decaturbridgewaterboard@nwempire.com [mailto:decaturbridgewaterboard@nwempire.com] **On Behalf Of** Gregory Lloyd
**Sent:** Wednesday, June 06, 2012 4:44 PM
**To:** Decatur Bridgewater Board
**Subject:** HOA Funds

Hello Decatur Board,

On Monday 06/04/2012 it was discovered that your HOA's funds have been inappropriately allocated. We have held all expenditures on your account at this time while a forensic accountant reviews your account. At this time you may want to work with your account manager at NW Empire to file a claim under your Fidelity Bond/Employee Dishonesty for the full amount in your reserves and operating accounts. The final number can be changed once it is known. We will need to set up a time next week with your board to open new accounts which only have board member signing ability on them.

We will be having a meeting Monday morning at 7:30AM at the NW Empire office located at 3330 NW Yeon Ave Suite 200, Portland, OR 97210 to discuss this situation with myself, our forensic CPA and fraud attorney. We will provide coffee, donuts, bagels, etc. for you. Please plan on attending this meeting.

If you would like to speak to John Brams (the forensic CPA) to discuss progress, please feel free to contact him at (503) 297-6466.

Kind Regards,

*Senior Community Manager*

503-482-6812 | *direct*
503-278-3231 | *office*
503-200-1114 | *fax*

PO Box 28205 | Portland, OR | 97228

1

EXHIBIT ____ 2 ____

11/09/2012  09:34 503 661 6124 ——— WCCS ——— #0246 P.002 /003

1

2

3          IN THE CIRCUIT COURT FOR THE STATE OF OREGON

4              FOR THE COUNTY OF MULTNOMAH

5   **CEDAR LAKE HOMEOWNERS**
    **ASSOCIATION**, an Oregon domestic
6   nonprofit corporation; and **DECATUR**
    **BRIDGEWATER VISTA**
7   **CONDOMINIUMS OWNERS'**          Case No. _____
    **ASSOCIATION**, an Oregon domestic
8   nonprofit corporation,            **DECLARATION OF ROBERT S.**
                                      **WATSON**
9              Plaintiffs,

10      v.

11  **NORTHWEST EMPIRE**
    **COMMUNITY MANAGEMENT, INC.,**
12  fka Professional Community Management,
    Inc., an Oregon corporation,
13
               Defendant.
14

15      Robert S. Watson declares as follows:

16      1.    I am the President of plaintiff Cedar Lake Homeowners Association ("Cedar Lake").

17  Cedar Lake is an Oregon nonprofit corporation.   The Cedar Lake subdivision is located in

18  Gresham.

19      2.    On or about June 9, 2011, Cedar Lake entered into a Management Agreement with

20  defendant.  Attached as Exhibit 1 is a true copy of the agreement.

21      3.    I understand and consent that a signed copy of this declaration that has been faxed to

22  Cedar Lake's counsel will be submitted to the court.

23  //////

24  //////

25  //////

26  /////

Page 1 -   DECLARATION OF ROBERT S. WATSON

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503-224-4100
503.224-4155 (facsimile)

*WATSON DECLARATION.13482-001*

Exhibit C Page 1 of 22

1    I hereby declare that the above statement is true to the best of my knowledge and belief,

2  and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

3    DATED this 9th day of November, 2012.

4

5                                                        Robert S. Watson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 2 -   DECLARATION OF ROBERT S. WATSON

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503-224-4100
503.224.4133 (facsimile)

*WATSON DECLARATION.13482-001*

Exhibit C Page 2 of 22

11/06/2012  16:52  503 661 6124        ——        WCCS        ——        #0245 P.002 /044


**PROFESSIONAL COMMUNITY MANAGEMENT**

June 6, 2011

# CEDAR LAKE HOMEOWNERS ASSOCIATION

Board of Directors
Cedar Lake Homeowners Association

RE:  Management Services Contract

Dear Board of Directors,

The management services contract has been reviewed and the following changes have been made:

Section **5.4 _Condemnation_** of the Management Services Contract most likely will never apply to a Planned Development, this item has been removed from the contract.

## Schedule A – Community Association Fee Schedule

Schedule A – Community Association Fee Schedule is a summary of the services and charges included in the management services contract.  This document defines charges that may be applicable for the Association at some point and clarifies specific fees outlined in the management services contract.   This document is an important part of the contract that will remain.

## Mortgage Application Fee

The mortgage application fee is a fee charged to homeowners by Professional Community Management for providing important documents required by lenders as a part of the sale process.    Professional Community Management will complete the required forms and provide the information on behalf of the Association for a fee of $75. Without these important documents the lender will not consider funding a loan. If we do not provide this information or make it available, it will be the responsibility of the Board of Directors to complete the forms and submit the information.   If the documents are not submitted timely or correctly, a sale could be lost and the Association could be in trouble for hindering a sale.   The Board does not usually provide these documents because of the liability involved and access to information.    This item will remain in the contract.

11/08/2012  16:52 503 661 6124            WCCS                    #0245 P.003 /044



PROFESSIONAL
COMMUNITY MANAGEMENT

June 6, 2011

**After Hours Emergency Response**

After Hours Emergency Response is an important item in our contract.   We changed the wording to make it clear that these calls are for items outside of the Homeowners Association's responsibility.   We do occasionally receive calls from owners for items outside of the management contract - especially if they have had an emergency and would like help sorting out the details.   For example, if a water-pipe inside the home broke, PCM would gladly help the unit owner with mitigation of damage and restoration if desired.   However, the charges related would be paid for by the owner or the owner's insurance.   This is outside of the management contract and would not be covered by the Homeowners Association.   This item will also remain in the contract.

Please let me know if you have any questions.  Thank you.

Yours truly,

Brad

*Brad Atchley*

Brad Atchley, CMCA, AMS, PCAM
Senior Community Manager
Professional Community Management

11/08/2012  16:52  503 661 6124          WCCS          #0245 P.004 /044



## PROFESSIONAL
## COMMUNITY MANAGEMENT

June 6, 2011

### CEDAR LAKE HOMEOWNERS ASSOCIATION

#### MANAGEMENT AGREEMENT
#### ARTICLE I.    PRELIMINARY RECITALS

**A.    REAL PROPERTY COVERED BY THIS AGREEMENT**

1. Association Name:  **Cedar Lake Homeowners Association**
2. Address:  **Gresham Oregon, Addresses to be added at signing**
3. Declaration Recording Date and Recording Number: **01/25/1993 – 93 009374**
4. Bylaws Recording Date and Recording Number:  **05/02/1994 – 94 0688278**
5. Declarant Name: **Lester H. and Patricia E. Brown**
6. Total Number of Units: **83 Lots / 81 Homes**

**B.    ASSOCIATION (Cedar Lake) AS PARTY TO THIS AGREEMENT**

1. Association Name: **Cedar Lake Homeowners Association**
2. Address:  **Gresham Oregon, Addresses to be added at signing**
3. Type of Organization:  **Non Profit Corporation, Home Owners Association**
4. Federal Tax ID No.:  **To be added at signing.**
5. Corporation Registry No. (If applicable): **N/A**

**C.    MANAGING AGENT (PCM, Inc. – Professional Community Management, Inc.) AS PARTY TO THIS AGREEMENT**

1. Name:  **PCM, Inc. – Professional Community Management, Inc.**
2. Address:  **PO Box 28205, Portland, OR 97228**
3. Phone: **503-278-3231**
4. Fax: **503-961-8796**
5. E-mail: **info@pcmnw.com**

## D.    DEFINITIONS

1.    "Association" shall mean a corporation formed under the Oregon Nonprofit Corporation Act, or an unincorporated Oregon Association, its successors and assigns.

2. "Base Fee" shall mean the monthly fee as identified in Section 8(a), (b) and (c), and covers Agent's basic contractual services exclusive of all extraordinary services which may occur by Board direction and exclusive of those services identified in Section 9 and Schedule A of this agreement.

3. "Board" or "Board of Directors" shall mean the Board of Directors of the Association, elected pursuant to the governing documents of the Association.

4. "Budget" shall mean a written, itemized estimate of the expenses to be incurred by the Association in performing its functions under its Declaration and/or Bylaws.

5. "Common Area" shall mean all the real property and improvements, including without limitation, landscape areas and lake, which are owned or controlled by the Association for the common use and enjoyment of all the owners.

6. "Governing Documents" shall mean the Declaration of the Homeowners Association, and other documents, such as Bylaws of the Association, which govern the operation of the Homeowners Association.

7. "Maintenance Assessments" shall mean those rates established and approved by the Board of Directors, which the Association members are bound to pay as their share of the common expenses and reserves. The term "Association" as used herein shall mean an Association consisting of all the Owners of lots in the Homeowners Association organized under the laws of the State of Oregon for the purpose of administering the Homeowners Association established by the Declaration for the real property.

8. "After Hours" shall mean any time outside of normal business hours for PCM Inc. PCM Inc. is open Monday—Friday 8am to 5pm— Pacific Coast Time Zone. PCM Inc. is closed during all major holidays and holidays observed by Banking and US Postal Institutions.

2

Exhibit C Page 6 of 22

E.    MISCELLANEOUS

In consideration of the covenants herein, the Association as described in B above enters into this Agreement with the Agent to manage the property described in A above for the compensation provided in Section 8 and for the term as set forth in Section 11 and subject to the Retainer Agreement, "Scope Of Services", Terms and Conditions set forth hereafter and made a part of this agreement. These documents are to be construed as one integrated written agreement between the parties, and include the recitals.

This written Agreement supersedes any and all prior representations, understandings and communications, and may be modified only by written agreement of the parties. Any oral agreements or modifications are expressly invalid. This written Agreement is to remain confidential between the Board and Agent, including after any termination of agreement.

This Agreement shall be construed in accordance with, and governed by, the laws of the State of Oregon. If any term, provision, covenant or condition of this agreement, including the Scope of Services, should be found by a Court of competent jurisdiction to be invalid, all other provisions shall continue in full force and effect, and shall in no way be affected, impaired or invalidated. If any legal proceeding is necessary to enforce or interpret the provisions of this Agreement, the prevailing party shall be entitled to its reasonable attorney's fees and legal costs, in addition to any other relief to which such party may be entitled. The parties agree that this agreement shall be effective as of the date set forth in the TERM OF CONTRACT. (Section 11)

If the Association is incorporated, it is understood and so assured by the signer that the person signing on behalf of the Association is a duly elected officer thereof, and has corporate authority to execute contracts. If Association is unincorporated, and this agreement is signed by both parties prior to the first (organizational) meeting of homeowners, it is understood and assured by the person signing on behalf of Association that the Association automatically assumes or will assume the full legal obligations of this Agreement for the full term stated in this Agreement, and that no provisions to the contrary are or will be included in the Governing Documents.

## ARTICLE II: "SCOPE OF SERVICES" APPOINTMENT AND ACCEPTANCE

The Association hereby exclusively employs the Agent, and appoints the Agent to manage the Association under the sole direction of the Board of Directors upon the terms and conditions hereinafter set forth. The relationship between the Association and Agent is one of Principal and Agent.

The Managing Agent (hereinafter called "Agent") shall deliver services reasonably necessary to provide Association with management services on behalf of the Association's Board of Directors, and strictly within the scope of this Agreement.

1.    MANAGING AGENT'S SERVICES AND RESPONSIBILITIES

1.1    The Association hereby appoints the Agent and the Agent hereby accepts appointment, on the terms and conditions hereinafter provided, as the Agent for the Association.

3

11/08/2012  16:52 503 661 6124          WCCS                      #0245 P.007 /044

1.2    The Association retains the primary responsibility for enforcement of provisions of the Association's governing documents and contractual agreements and assumes liability for any and all acts and occurrences which relate to the actions of the Association, and its actions concerning the real property covered by this contract.

1.3    Agent shall undertake reasonable efforts to implement the lawful decisions of the Board of Directors and in accordance with the Terms and Conditions of this agreement, subject to the compensation schedule set forth herein. Agent shall not be obligated to implement any decision which:

      a)    is contrary to the terms of this Agreement, applicable laws or Governing Documents,

      b)    would involve transactions or services outside the Agent's expertise, knowledge or licenses,

      c)    would involve transactions or services which are not set forth in this Agreement.

1.4    It shall be the responsibility of Agent, during the term of this Agreement, to perform the duties as set forth in this Agreement, consistent with the plans and directives of the Association's Board of Directors, and to perform such other acts as are reasonably necessary to discharge Agent's responsibilities.

## 2.    FINANCIAL MANAGEMENT

2.1    Maintenance Assessments. The Agent shall provide for the collection and deposit of all maintenance assessments at intervals as set by the Board of Directors and agreed to by Agent. Agent shall establish a separate checking account or accounts, with, at its sole discretion, any federally insured institution(s), as is customary with other Associations managed by Agent for the deposit of Association's operating funds. Agent is authorized to provide information to owners' escrow and mortgage companies regarding assessment account status and to charge reasonable processing and administrative set up fees.

2.2    Association Operating Funds. Agent shall establish and maintain Association funds, in a bank of Agent's choice, whose deposits are federally insured and in a manner to indicate the custodial nature thereof, a separate bank account as Agent of Association for the deposit of monies of Association, with authority to draw thereon for any payments to be made by the Agent to discharge any liabilities or obligations incurred pursuant to this agreement and for the payment of the Agent's fee, all of which payments are subject to the limitations of this agreement. From funds collected, Agent shall cause to be paid the expenses for the operation of Association in accordance with the approved budget or as otherwise authorized by Association's Board of Directors. Any service fees charged for banking services or account maintenance by the bank shall be the responsibility of the Association, and shall be a charge against Association's operating and/or money market accounts. The President, Secretary/Treasurer of the Board of Directors will not have authority to sign checks, only the Agent shall have the authority to sign checks from the Association's account. All checks with the copy of invoice will be mailed to the

4

Exhibit C Page 8 of 22
PAGE   12  OF

11/08/2012  16:53  503 661 6124          WCCS          #0245 P.008 /044

Treasurer for final approval and mailing.  Checks shall not be distributed without the initials of the Treasurer or other appointed Board member.

2.3    Delinquent Accounts. Agent is authorized to take reasonable steps for collection of delinquent accounts. In the event such efforts fail, Agent shall have the authority to record a lien against the delinquent owner's unit in accordance with the Governing Documents, state of Oregon statutes, and the approved collection policy. The Agent is authorized to assess the delinquent account a late charge and a delinquent processing charge, along with other charges for collection, lien and late notice fees, reflective of the costs of collection, accounting, payment plan monitoring and legal proceedings. Agent shall be paid 50% of any late charges billed to accounts. Statutory interest may be charged commencing 30 days after any due date. Reasonable costs of collection, including attorney's fees, are authorized to be charged and collected per Schedule A.

2.4    Disbursement Authorization. Agent is authorized and shall make all disbursements from Association funds for liabilities incurred on behalf of Association. Association acknowledges Agent's role as Paymaster. Accordingly, such disbursements may be made via paper drafts or electronically at the discretion of Agent. Agent is authorized to utilize all fraud control systems and methods available to Agent for the protection of Association's funds. Agent is hereby granted authority to make any reasonable, non budget expenditure as provided in this section at its own discretion up to $500.00 in any fiscal month. In addition, Agent shall have the authority to make normal and usual expenditures, as prescribed by the Board of Directors and by the Association's approved operating Budget. Agent shall use best efforts to try to obtain approval for any extraordinary expenses of the Association, in advance, as needed.  The Treasurer will be mailed a copy of all checks signed on behalf of the Association with a copy of the invoice for final approval and mailing.  Checks shall not be distributed without the initials of the Treasurer or other appointed Board member.

Emergency repairs involving imminent danger to life or property, or immediately necessary for the preservation and safety of the property, or for the safety of the Members, or required to avoid the suspension of any necessary service to the Association, may be made by the Agent irrespective of the cost limitation imposed by this section.

Agent shall establish Association's reserve accounts at Association's direction. Agent makes no warranty or representations regarding the security or yield of any reserve investment. Except for the disbursements provided for above, all reserve account disbursements will be approved in writing or via email by two members of the Board of Directors, upon which Agent is authorized to sign for such disbursement from a reserve account.

2.5    Accounting and Financial Statements. Agent shall maintain a set of accounting records in accordance with generally accepted accounting principles.

a)    Agent shall distribute monthly to all members of the Board of Directors a financial statement for the previous month, including copies of the Balance Sheet, Statement of Income and Expenses, Schedules of Cash Investments, reserve allocations, and a check register of disbursements.

5

b)      Agent shall reconcile all bank statements and shall provide to the Board copies of both statements and reconciliations.

c)      Agent shall cooperate with auditors in their performance of audits and reviews of Association's records and their preparation of applicable tax returns in accordance with *Schedule A.*

d)      Agent shall, upon direction from the Board of Directors, distribute to all members, at Association expense, copies of annual financial reports, budgets, collection policies, and all other publications and reports deemed necessary by the Board of Directors and applicable laws.

2.6     Budget Preparation.  Agent shall prepare and submit to the Board of Directors a proposed budget annually, cost for such service is outlined in *Schedule A* to this contract. Any budget draft will be subject to final approval by the Board of Directors and the Board shall retain full responsibility for the appropriateness of data contained in the budget. Agent shall use its best efforts to prepare such proposed budget in compliance with any statutes. Any decision to adopt Agent's proposed budget or reserve analysis, or to amend it will be reserved to and exercised solely by the Association's Board of Directors.

2.7     In the event the Association elects to have an outside firm perform a reserve study, Agent agrees to cooperate with said outside firm and to furnish any and all necessary forms and documents in Agent's possession, upon request. Agent shall be compensated in accordance with *Schedule A* for this consultation.

2.8     All postage and supplies associated with this Agreement will be at the expense of the Association and reimbursed to the Agent under conditions of Section 8 hereinafter.

3.      **PHYSICAL MANAGEMENT**

3.1     Maintenance. Agent shall assist the Board of Directors in its responsibilities for the upkeep, maintenance and management of Common Areas and the equipment, pursuant to the Association's documents and within the scope of this agreement.

3.2     Agent shall receive maintenance requests and/or complaints concerning Association's Common Areas, and communicate them to the Board of Directors, or if so directed by the Board, to the appropriate contractors and vendors for correction, repairs or maintenance.

3.3     ~~Agent shall provide a 24 hours per day, 7 days per week call center to assist or refer emergencies in the Common Areas of the Association. Serious matters will be reported to the Association's Board of Directors with appropriate recommendations for the purpose of receiving further instructions from the Board on how to proceed. Agent shall receive and/or assist calls after normal working hours. Agent shall be entitled to a fee for after hours calls requiring an immediate response in excess of two (2) calls within a given month, in accordance with Schedule A. Unused calls do not carry forward to future months. Onsite visits necessitated, at discretion of Agent, by such calls, shall be charged at the hourly rate in accordance with Schedule A, noted for Manager's Extra Time, portal to portal.~~

6

Exhibit C Page 10 of 22

11/08/2012  16:53  503 661 6124  ———  WCCS  ———  #0245 P.010 /044

3.4    Agent shall perform site visits as outlined in *Schedule A*. Site visits are defined as a review of the Common Areas from ground level only. Agent will submit findings, action taken and recommendations to the Board of Directors to assist in preserving the aesthetics of the common areas. Agent is authorized to initiate routine repairs to the common areas,so long as such repairs and maintenance are in compliance with the Board's adopted management plan created by the Board or within a reserve study if one is present, for the Association, or Section 2.4 herein.

3.5    Bids for Hiring, Supervising and Discharging Third Party Contractors.

a)    Agent shall, upon receipt of instructions or upon resolution of the Board of Directors, request bids from insured vendors of Agent's and Board's selection, with a minimum of two (2) and a maximum of three (3) bids for the types of third party goods or services that Agent believes, in his sole discretion, are likely to cost $3,500.00 or more. Those items for which the Board requests bids that are in the Agent's sole discretion likely to less than $3,500.00 will not be let out for bid, and Agent shall be under no duty to solicit bids for those items. Should the Board wish for Agent to solicit bids for an item costing less than $3,500.00, Agent shall be entitled to an hourly fee in accordance with Section 9.1 of this agreement. Specifications for all items shall be included with the Board's request, and the Board shall be solely responsible for establishing the standards, specifications or criteria for work to be let out for bid. Agent will endeavor to make helpful suggestions; however, the final decision in establishing standards, specifications and criteria shall be the Association Board's.

b)    Agent shall, upon receipt of the Board's written instructions or resolution, discharge contractors that the Board decides are not performing up to the standards, specifications or criteria established by the Board of Directors. Agent, on the basis of an operation schedule, job standards and compensation rates approved by the Association shall investigate, secure and pay third parties in order to maintain and operate the Association. Any contract for such third party contractors will be a direct contract between the Association and the third party contractor, and Agent shall act solely as the Agent of the Association in negotiations and maintenance of said contract, and not as a contracting party. Compensation for the services of all third party contractors shall be paid by the Association. Agent shall have no authority to sign any contract on behalf of Association unless the Board of Directors has granted such authorization to Agent in writing.

~~3.6    Agent is authorized to install a key lockbox in the event one is needed for maintenance purposes in a location mutually agreed upon between Association and Agent.~~

4.    **ADMINISTRATIVE MANAGEMENT AND CONSULTING**

4.1    Agent shall organize the records and documents it receives from the Association or their prior manager or Management Company in accordance with its normal procedures. Within sixty (60) days from receipt of complete records, Agent shall render financial statements

7

EXHIBIT
Exhibit C Page 11 of 22
PAGE

11/08/2012  16:53 503 661 6124      ———      WCCS      ———      #0245 P.011 /044

in their usual form showing the financial status of Association, or, if the records are inadequate to prepare such financial statements, Agent shall submit a written recommendation to Association. If such recommendation suggests a review or audit by a third party, or additional investigation and organization of information that will permit the publication of financial statements, Agent shall provide estimated cost of performing such services.

4.2     In accordance with *Schedule A*, Agent shall attempt to first notify owner via phone as a courtesy, write letters and communicate as necessary to assist the Board in carrying out its responsibilities. Agent will also receive and write letters to homeowners and others concerning violations of Association documents and rules, homeowner's requests, architectural and maintenance matters, etc.

4.3     Agent shall counsel and advise Board of Directors and its committees in their day-to-day operations.

4.4     Agent shall assist in interpretation of the rules of the Association and suggest alternative steps of enforcement.

4.5     Agent shall provide, at Association's sole cost and expense, material and expertise in the development of methods of communication to the unit owners (rules and regulations, etc.), as necessary.

4.6     Meeting Notices. In accordance with *Schedule A*, at the Association's sole cost and expense, Agent shall send notices of Association meeting's, prepare the Agenda for said meeting, circulate minutes of any such meetings as prepared by the Secretary, and effect instructions as approved by the Board of Directors.

4.7     In accordance with *Schedule A*, Agent shall assist in preparation for Association Annual Homeowners Meeting, including notices, proxies, ballots and agenda.

4.8     Agent shall not be responsible to record and/or type minutes of regular meetings of the Board of Directors or the Annual Meeting of the Association. Upon request by the Board of Directors, Agent shall coordinate a third party to serve as recording secretary, the costs for this service shall be borne by the Association.

4.9     Association Records. Agent shall maintain possession of all records, with the exception of correspondences, of the affairs of the Association throughout the term of this Agreement. Agent shall maintain possession of correspondences for a limited period of six years from the date received by Agent.     While Agent shall put forth every effort to maintain Association records in good order, Agent makes no representation or warranty as to the accuracy and/or completeness of such records. Accuracy and/or completeness of the Association records remain the responsibility of the Association.

4.10     Review of Records. During the term of this Agreement, Agent shall make Available for review by the Board all records in Agent's possession that pertain to the Homeowners Association, with the exception of correspondences.  Correspondences pertaining

8

Exhibit C Page 12 of 22

to the Homeowners Association shall only be held by Agent for a period of six years from the date received by Agent, after which time such correspondences shall not be retained by Agent. Association agrees that Agent shall charge a fee in accordance with *Schedule A* for records research and for the scheduling and monitoring of such a review.

4.11    Special mailings and newsletters requested by the Board, as prepared by the Association and Agent, shall be prepared, duplicated and mailed at the expense of the Association. All requests for copies of project documents, correspondence, reports, etc., will be at the expense of the Association.

4.12    Agent shall not be responsible for any contractor, sub-contractor or Association Employee's work performance or adherence to specifications or schedules.

4.13    Agent shall attend Annual Homeowners Association Meeting in accordance with Schedule A.   Agent shall attend Boards of Director Meetings in accordance with *Schedule A*. Meetings shall be at the direction of the Board of Directors.

**5.      TERMINATION OF AGREEMENT**

5.1    Termination. Either party may terminate this agreement by providing sixty (60) days written notice to the other. This termination provision may be invoked with or without cause. Upon such notice of termination, both parties agree that this Agreement shall remain in full force and effect for the entire sixty (60) days.

5.2    Arbitration Provision. In the event of a dispute over the performance and/or non-performance by either party in this agreement, the alleging party shall offer arbitration to the offending party prior to initiating legal action to gain compliance with the terms and conditions set forth by this agreement.

Prior to requesting arbitration, the alleging party must provide the offending party written notice of the dispute. Such notice shall allow for a reasonable time, not to exceed thirty (30) days, for the offending party to comply with this Agreement. After the expiration of said thirty days, the alleging party can proceed to binding arbitration. Upon acceptance of a written demand for arbitration, the dispute shall be submitted to arbitration with a single arbitrator mutually selected by the parties from a list of five arbitrators submitted by the American Arbitration Association. The determination of the arbitrator shall be binding upon both parties. The arbitration shall be conducted pursuant to the rules of the American Arbitration Association and shall be submitted within 120 days of submission. Upon making a written demand for arbitration, the dispute shall be submitted promptly to an arbitrator mutually selected by the parties and the determination of the arbitrator shall be binding upon both parties. If the arbitrator shall determine that offending party has committed a material breach of this Agreement, then such finding shall furnish the aggrieved party with the right to terminate the contract 30 days after the final decision of the arbitrator. In the event that the parties cannot mutually select a single arbitrator, the arbitrator will be selected by the American Arbitration Association from the remaining names.

5.3    Termination Fee. Each party shall be responsible for any costs they incur in the termination of this agreement. Agent shall be reimbursed for all duplication costs and transition materials including boxes, files, postage and any delivery costs.

~~5.4    Condemnation. Upon taking of the entire or a substantial portion of the Project through lawful condemnation proceedings by any governmental party, either party may terminate this agreement by serving 30 days written notice by certified mail to the other party.~~

# 6.    RECORD RETENTION

6.1    The Association's current records shall be kept at the Agent's office. Such records shall be available for inspection and copying during Agent's normal business hours in accordance with Oregon state laws and the Governing Documents, Monday through Friday. Agent shall be entitled to charge and receive copying and document research costs, as set forth in *Schedule A*, from anyone requesting copies of records or documents, before making such copies. Agent shall be entitled to reasonable notice prior to such inspection or copying of records.

6.2    Homeowners Lists. Agent shall maintain a current list of homeowners in the Association in accordance with the information supplied to Agent. Reasonable efforts will be made to keep this list accurate, but it shall be the responsibility of the Association to advise Agent of address or ownership changes of which it becomes aware. Agent shall not be obligated to search official records or other record sources for such transfers of ownership unless specifically requested to do so by the Board at hourly rates set forth in this agreement. Agent will record changes of address or ownership upon advice from owners, with supporting documentation.

6.3    Correspondence. Agent shall maintain documents and complete files for all current correspondences relating to Association, such as incoming homeowner correspondence, violation and architectural control letters, contracts, purchase orders, filing with public agencies, insurance policies and information and other related documents. Correspondences shall only be retained by the Agent for six (6) years from the date received, after which such correspondences may be disposed of by Agent. Agent shall only retain electronic copies of correspondences.

6.4    All records and correspondence regarding Association are and will remain the sole property of Association. Agent agrees to return any and all such records and correspondence to the Association, or to an entity or person designated in writing by the Board of Directors upon termination of this Agreement. Such records shall be available for pick up at Agent's office or such other designated location as may be agreed upon. Electronic media, such as computer tape, discs, and general electronically stored databases are the sole property of the Agent. However, Agent shall provide Association with a hard copy of all such records, as requested, at the sole cost and expense of the Association per *Schedule A*.

6.5    Agent agrees to maintain storage of Association records and correspondence at the sole cost and expense of the Association per *Schedule A*.

10

Exhibit C Page 14 of 22

11/08/2012  16:54  503 661 6124          WCCS                    #0245 P.014 /044

## 7.    INSURANCE AND INDEMNIFICATION

### AGENT'S INSURANCE

7.1    Agent shall, throughout the term of this Agreement, and at Agent's expense, maintain the following insurance coverage:

a)    Fidelity bond or employee dishonesty insurance will be provided for all Agent's employees, when applicable, to protect Association funds.

b)    Agent's liability insurance and comprehensive general liability coverage, including automobile liability, completed operations, blanket contractual and personal injury coverage, with combined single limits of $1,000,000 property damage and liability.

c)    Workers Compensation Insurance in the statutory amount, covering any of Agents employees.

### ASSOCIATION INSURANCE

7.2    Association shall maintain at its sole expense a policy of comprehensive general liability, Directors and Officers, worker's compensation and property insurance (as necessary) in accordance with the Governing Documents and applicable Oregon State codes.

7.3    Association shall name Agent as an additional named insured on the Association's policies of comprehensive general liability and said insurance policies shall cover Agent for any and all claims and losses indemnified by Association pursuant to Section 7.7. Agent shall be provided with insurance certificates identifying Agent as additional insured showing the amount of coverage to be furnished to the Agent.

7.4    In the mutual interest of Association and Agent, both parties agree that fidelity insurance coverage protecting Association funds shall be a crime policy, so long as such coverage is available. The limits of the crime policy shall be no less than the total amount of the Association's reserve funds plus three (3) months total assessment income.

7.5    In the event the Association fails to maintain agreed upon insurances, Agent may unilaterally terminate this Agreement immediately, and the provisions of Section 5.1 above shall not be applicable to Agent's action.

7.6    Agent shall maintain reasonable communication with Association's insurance agent and will assist the Board in reviewing and renewing insurance coverage, including solicitation of bids for such coverage. The Board of Directors is solely responsible for maintaining insurance coverage for the Association, and for adequacy of coverage.

11

11/08/2012  16:54 503 661 6124        WCCS        #0245 P.015 /044

## INDEMNIFICATION

7.7    Association shall indemnify, defend, and hold harmless Agent and its employees, agents, officers and directors from and against any and all claims, demands, losses, costs, expenses, obligations, liabilities, judgments, orders and damages, including interest, penalties and attorney's fees, that Agent shall incur or suffer, which arise, result from or relate to the performance by Agent of its duties under this Agreement in good faith and in the ordinary course of business, except for the willful misconduct or gross negligence of Agent This includes, without limitation and, for example, a situation in which Agent is made a party to litigation, arbitration or other proceeding brought by a unit owner, a member, a contract vendor of the Association, or an outside party by reason of Agent's position as Agent or its activities hereunder. This provision shall survive any termination of this Agreement.

7.8    Agent shall only be responsible for the willful misconduct or gross negligence where such liability is due to the sole conduct of Agent and/or its employees in its performance of its duties under this Agreement.

8.    COMPENSATION ENHANCED MANAGEMENT SERVICE

In consideration of Agent's acceptance of its appointment hereunder and the performance of services as set forth herein, the compensation to which the Agent shall be entitled will consist of fees for basic services (Base Fee) which are considered due upon execution of this Agreement, but are paid monthly, along with those fees and costs for special or extraordinary services as set forth in *Schedule A*.

a)    Agent shall be paid in advance on the first day of each month without prior Association approval.

In accordance with *Schedule A*, the total monthly base fee will remain in effect for a period of 1-year from date of contract signing.

b)    The base fee, as defined, shall be net to Agent and is exclusive of the Association's operating expenses and costs. The base fee shall be superseded by the adoption of a new annual Association budget indicating an adjusted base fee for management services. Adoption of the annual budget by the Association's Board of Directors shall constitute an approval of a base fee change under this Agreement as noted in section 8c, but in no event shall the base fee be less than the amount stated in *Schedule A*.

c)    Annual increase.  During the budget process, PCM reserves the right to review each contract and increase the management fee as necessary to cover the costs associated with management services.  This increase shall be approved during the budget process and shall not exceed 5% per year.

12

11/08/2012  16:54  503 661 6124             WCCS                    #0245 P.016 /044

d)      In the event that an emergency occurs, and Agent reasonably believes that responding to the emergency would cause Agent to exceed the prescribed hours, Agent will make all reasonable efforts, given the circumstances, to notify Association and receive authorization to proceed. However, Association's lack of timely response shall not prevent Agent from responding to protect Association in a reasonable manner.

8.1      Agent's Fees and Costs. Any base fees and costs due the Agent will be paid promptly each month on the first of each month. Any monies due and billed and not paid to Agent by the fifteenth (15th) of each month will carry a 1.5% per month late fee which will be added to the balance due and will be subject to further late charges until paid. Interest at the maximum legal rate to be charged thirty (30) days after any amounts are delinquent.

8.2      Reimbursable Administrative Operating Expenses. The Association shall reimburse Agent for all postage costs incurred by Agent on Association's behalf. In addition, Association will reimburse Agent for all reasonable expenses incurred on behalf of the Association including, but not limited to, those expenses listed in *Schedule A* attached hereto, as may be amended from time to time, and included herein. Said costs will be reimbursed on a monthly basis as incurred and billed.

8.3      Deduction of Agent's Compensation. Association shall be obligated to pay, and Agent shall receive as compensation for its services under this Agreement the sum provided for in this section herein and above at the times therein set forth. Agent is entitled to deduct such compensation when due from the funds then in its possession. Agent's compensation covers normal and usual administration expenses of Agent required by actions of the Board of Directors.

## 9.     SPECIAL OR EXTRAORDINARY SERVICES

9.1      Association shall pay Agent compensation in accordance with *Schedule A* for services performed on behalf of Association outside the normal course of operation or outside the parameters of this agreement. These items shall include, but not be limited to, hours spent in oversight or management of work directly related to construction defect claims and/or time specifically expended in oversight or management of major reconstruction project(s).

9.2      Agent may be required to perform additional services beyond the scope of these services, for which the above fees, or the current rates that are then applicable, will be charged by the work performed. Examples of such services are, but not limited to:

a)      Assistance in adhering to requirements of laws and regulations, which may be passed during the term of the Agreement that requires Agent participation.

b)      Agent shall be paid per hour, at the Manager's rate as shown in *Schedule A*, portal to portal, for work performed by Agent on behalf of Association, including but not limited to, appearance at court, at hearings, depositions, claims negotiations and processing of insurance losses or reconstruction, performing committee functions, such as

13

EXHIBIT  /
PAGE ____ OF ____

Exhibit C Page 17 of 22

monitoring, reporting and updating of any architectural progress, development status reports, bank loans, investments, maintenance, construction defect matters, financial reconstruction, discovery on Association's acts prior to the original commencement date of this Agreement.

Agent shall only be paid for the services identified above if performing said services cannot be accomplished, along with Agent's other duties defined herein, within the hours prescribed by Section 8, paragraph (c) of this Agreement.

c)    If requested by Board to attend meeting, Agent shall be paid per hour, at the Manager's rate, for attendance at Board or annual meetings, minimum of one (1) hour, and in half-hour increments thereafter. Portal to portal time will apply if meeting location is greater than 20 miles from Agent's main office.

## 10.    ASSOCIATION SET UP FEE

10.1    Agent shall be paid a one-time, non-refundable fee as indicated in *Schedule A*. This fee is due at the commencement of this Agreement to offset the costs of setting up the Association's records. Not included in such set up fee are bank charges or Board authorized independent accountant fees, which may also be incurred.

## 11.    TERM OF CONTRACT

11.1    Commencement Date. After execution of this contract by the Association's Board of Directors, Agent's compensation shall commence upon the day indicated in the following paragraph.

11.2    This Agreement shall commence upon signing and shall continue in full force and effect for twelve months, and thereafter from month to month.

## 12.    AGENT AND ASSOCIATION PROTECTION

12.1    Agent's Employees. Agent spends significant amounts of time and money to hire and train employees for the operation of this and other Associations. Association derives and benefits from Agent's management experience, their hiring and training procedures. Association agrees it will not hire, retain, or contract with any employee, partner, officer, or co-owner of agent or its parent company or divisions in any capacity whatsoever for a period of six (6) months following the termination of this Agreement or any extension thereof. Association agrees to pay Agent the sum of Ten Thousand Dollars ($10,000.00) as liquidated damages if it breaches this provision of the Agreement. Both parties agree that this is a reasonable sum due to the extensive training and trade secrets that Agent provides, as well as expectation of continued income and allotment of resources, and further with respect to the difficulty in establishing the amount of actual damages.

14

12.2    Association shall have access to and be dealing with trade secrets of Agent, such as: confidential information pertaining to client lists; procedures, processes and documentation relating to management of Agent's client Associations; and programs, software, procedures and techniques relating to data processing and financial reporting. Association agrees to hold any such trade secrets or confidential information, attained during the course of this Agreement, in the strictest confidence, and shall retain a total confidentiality, giving value to protecting them from Agent's competitors. This provision shall survive termination of this Agreement.

12.3    All materials of a confidential nature, prepared and utilized in Agent's performance of their duties under this Agreement, shall remain the exclusive property of Agent, and shall be retained in Agent's possession.

### 13.    MISCELLANEOUS

13.1    Advances and Charges. Agent shall not be required to, perform any act or duty hereunder involving the expenditure of money unless Agent shall have in its possession sufficient funds of the Association available. Therefore, if at any time the funds in the possession of Agent are not sufficient to pay the charges incident to this Agreement, Agent, shall not be responsible to advance its own funds for any reason, and the Association agrees, in such cases, that upon notice thereof by Agent, the Association shall make immediate arrangements to make funds available to cover the insufficiency.

13.2    Agent shall receive communications and directions from any Association Director, and shall present the direction to the Board as a whole.  PCM will act on behalf of the Board when a majority of the Board votes in favor of an action either in writing, email, or noted in the minutes from an open Board Meeting.   Should a conflict arise between Directors, PCM will wait until a majority of the Board members are in agreement before taking action.

The Association Board of Directors understands its fiduciary duties, and agrees to govern the Association in a businesslike manner, acting in good faith and in the best interest of the Association and will work to adopt a business management plan for the future of the Association.

13.3    Successors and Assigns. This Agreement will be binding upon and inure to the benefit of the successors and assigns of the Association. This Agency agreement shall be binding on the parties hereto, their heirs, executors, administrators, successors and assignees, and constitutes the full agreement except that subsequent changes or additional provisions must be agreed upon in writing and executed by both parties.

Notwithstanding the preceding sentence, the Agent shall not assign its interest under this Agreement except in connection with the sale of all or substantially all of the assets of its management business. In the event of such a sale, Agent shall be released from all liability by the Association.

13.4    Association and Agent acknowledge that they have carefully read and reviewed this agreement and each term and provision contained herein including any addendums or

EXHIBIT ____/_____
PAGE ____/_____

Exhibit C Page 19 of 22

additions such as *"Schedule A – Community Association Fee Schedule"* and by execution of this Agreement show their informed and voluntary consent thereto. The parties hereby agree that, at the time this Agreement is executed, the terms of this Agreement are commercially reasonable and effectuate the intent and purposes of the Association and Agent with respect to the service agreement.

14.    DISCLAIMER

No representation or recommendation is made by the Agent or its employees as to the legal sufficiency, legal effect, or other consequences of this Agreement. The parties shall rely solely upon the advice of their own legal counsel as to the legal and other consequences of this Agreement.

By affixing signatures below, both Association and Management Agent agree to the terms, conditions and provisions specified by this Agreement.

ASSOCIATION:                          AGENT:

By: _____        By: _____

Title: President                     Title: Senior Community Manager

Date: 6/9/2011                       Date: 06-9-11

16

11/08/2012  16:55  503 661 6124                    WCCS                              #0245 P.020 /044



<u>*Schedule A*</u>

**Community Association Fee Schedule**

*FOR*

**Cedar Lake Homeowners Association**

Account Fees

| Initial Set-up Fee                                                (Waived - $0.00 Per Unit) | $0.00 |
|---|---|
| Monthly Management Fee — Includes ~~Quarterly~~ Up to Three (3) Board Meetings Per Year Including Preparation and Attendance | ~~$795.00~~ $475.00 |

Additional Fees and Charges to the Association

| | |
|---|---|
| Special Mailings (Information Postcards, etc – Upon Request) | $105.00 |
| Annual Meeting Organization, Notice & Voting Ballots (~~Quarterly~~ Up to Three (3) Board Meetings per year including preparation and attendance – Monday through Friday - included in fee) | ~~$250.00~~ Included |
| Special Meeting Organization, Notice and Voting Ballots | $250.00 |
| Site Inspections – Up to Twelve (12) | Included |
| New Board Member Training & Orientation (Through PCM's On-line Training and Resource Center) | Included |
| Monthly Financial Statements | Included |
| Excessive Violation Charge (Defined as more than 20% or 16 units having a violation in a single month) | $75.00 |
| Capital Project Management (Projects in excess of $3,500.00) – *As requested by Board* | 10% of Total Project Cost |
| Architectural Application Processing – *As requested by Board* | $35.00 Each |
| Bids for Repairs or Service | $35.00 Each |
| Yearly Budget Preparation | ~~$250.00~~ Included |
| Yearly Maintenance Plan Update | ~~$250.00~~ Included |
| End of Year 1099 Preparation (Fee Per Vendor) (Tax preparation is a separate charge) | $15.00 Each |
| Assisting with Insurance Claims Process | $105.00 Per Hour |
| All Postage Used for Association Purposes | U.S. Postal Rates |
| B&W Paper Copies | $0.20 Each |
| Color Copies | $0.58 Each |
| Check Stalk – Check Printing Charges | $0.32 Each |
| Envelopes | $0.15 Each |
| Late Fee Assessments | 50% of Collected Charge |
| After Hours Emergency for HOA Related Items | $35.00 |
| After Hours Onsite Presence for HOA Related Items | $105.00 Per Hour |
| Electronic Document Storage & Record Retention | Included |
| Website – Including Monthly Updates | Included |

*Please Note: PCM does not charge for Bank fees, document scanning, faxes or long distance phone calls.*

**PROFESSIONAL COMMUNITY MANAGEMENT** LLC
(503) 278-3231 • PO Box 28205 Portland, OR 97228 • WWW.PCMNW.COM

EXHIBIT
Exhibit C Page 21 of 22

11/08/2012   16:55 503 661 6124   ———   WCCS   #0245 P.021 /044



**PCM PROFESSIONAL COMMUNITY MANAGEMENT**

## Schedule A
### Community Association Fee Schedule
#### FOR
### Cedar Lake Homeowners Association

#### Additional Fees and Charges to Individual Owners
These fees are charged to the homeowner as a pass through fee for the
Association and are not a direct fee to the HOA.

| | |
|---|---|
| Rules Enforcement Letter -- Notice of Violation | $35.00 Per Letter |
| Intent to Lien Letter | $50.00 |
| Preparation, Recording & Release of Lien (This does not include attorney fees) | $250.00 |
| Processing Returned Checks (fee does not include bank charges) | $45.00 |
| Replacement of Common Area Access Cards and/or Keys | $25.00 |
| New Home Owner Set-up Fee (New Buyer) | $75.00 |
| Mortgage Application Fee - *In the event the transaction does not close we will not collect the fee* (Includes condo cert, budget, financials & 12-months of Board Meeting Minutes) | $75.00 |
| Escrow Administration - *In the event the transaction does not close we will not collect the fee* | $75.00 |
| Additional or Replacement Copies of Governing Documents (Email copies or copies via the Association's website are free) | $15.00 + Postage |
| After Hours Emergency Calls (If issue is not HOA Related) | $35.00 |
| After Hours Emergency Onsite Presence (If issues is not HOA related) | $105.00 Per Hour |

### *Any other services or activities will be charged at cost of materials plus $105 per hour*
****Costs of the above services may be subject to change w/out notice**

6/9/2011
Initial & Date

**PROFESSIONAL COMMUNITY MANAGEMENT LLC**
(503) 278-3231 • PO BOX 28205 PORTLAND, OR 97228 • WWW.PCMNW.COM

EXHIBIT ___
Exhibit C Page 22 of 22

FILED

13 JAN 28 AM 11: 35

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

CIRCUIT COURT
FOR MULTNOMAH COUNTY

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| **CEDAR LAKE HOMEOWNERS ASSOCIATION**, an Oregon domestic nonprofit corporation; and **DECATUR BRIDGEWATER VISTA CONDOMINIUMS OWNERS' ASSOCIATION**, an Oregon domestic nonprofit corporation, | Case No. 1211-14420<br><br>**MOTION FOR ORDER OF DEFAULT AND GENERAL JUDGMENT** |
| Plaintiffs, | |
| v. | |
| **NORTHWEST EMPIRE COMMUNITY MANAGEMENT, INC.**, fka Professional Community Management, Inc., an Oregon corporation, | |
| Defendant. | |

ENTERED

FEB 1 1 2013

IN REGISTER SOL

Plaintiffs, appearing by and through their attorneys, Stuart K. Cohen and James S. Crane of Landye Bennett Blumstein LLP, move the court for entry of an order of default and judgment against defendant, Northwest Empire Community Management, Inc., it appearing that Defendant was duly served with summons and complaint in Multnomah County, Oregon, on November 12, 2012, and that Defendant has not filed any answer or made any other appearance, although the time provided for such an appearance has expired.

As points and authorities, Plaintiffs rely on the accompanying Memorandum, the exhibits to the Memorandum, the Declaration of James S. Crane, and the records and files of this court.

DATED this 25 day of January, 2013.

LANDYE BENNETT BLUMSTEIN LLP

By:_____
Stuart K. Cohen, OSB #851738
James S. Crane, OSB #901420
*Of Attorneys for Plaintiffs*

Page 1 -   MOTION FOR ORDER OF DEFAULT AND GENERAL JUDGMENT

706154.14501-002

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224-4100
503.224-4133 (facsimile)

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

FILED
13 JAN 11 PH 1: 26
CIRCUIT COURT
FOR MULTNOMAH COUNTY



**CEDAR LAKE HOMEOWNERS ASSOCIATION**, an Oregon domestic nonprofit corporation; and **DECATUR BRIDGEWATER VISTA CONDOMINIUMS OWNERS' ASSOCIATION**, an Oregon domestic nonprofit corporation,

Plaintiffs,

v.

**NORTHWEST EMPIRE COMMUNITY MANAGEMENT, INC.**, fka Professional Community Management, Inc., an Oregon corporation,

Defendant.

Case No. 1211-14420

**GARNISHEE'S RESPONSE**

The writ of garnishment was delivered to me on the ___21st___ day of ___December___, 2012. The following responses are accurate and complete as of that date.

PART I: DEBTOR'S PROPERTY GENERALLY
(ALL GARNISHEES MUST FILL OUT THIS PORTION OF THE RESPONSE)

Place a check in front of all the following statements that apply. You may need to check more than one statement.

☐    I have discovered that a voluntary or involuntary bankruptcy petition has been filed by or on behalf of the Debtor after the date shown on the face of the writ as the date on which the judgment was entered against the Debtor or after the debt otherwise became subject to garnishment. (You need not complete any other part of this response, but you must sign the response and deliver it in the manner specified in Step 2 of the Instructions to Garnishee form.)

☐    I do not employ the Debtor, I do not have in my possession, control or custody any personal property of the Debtor, and I do not owe any debts or other obligations to the Debtor.

☐    I employ the Debtor. (You must complete Part II of this response.)

☐    I have in my possession, control or custody garnishable money that belongs to the Debtor (other than wages), or I owe a debt or other obligation to the Debtor (other than wages) that is due as of the time of this response. I am forwarding this money, or enough of it to satisfy the garnishment, to the Garnishor.

☐    I owe a debt or other obligation to the Debtor (other than wages) that was not due as of the time of this response but will become due within 45 days after the writ was delivered to me. I will forward the money, or enough of it to satisfy the garnishment, to the Garnishor when the debt or other obligation becomes due.

☐    I owe the following debt or other obligation to the Debtor (other than wages) that will not become due within 45 days after the date that the writ was delivered to me. I will not make any payments on the debt or obligation until I receive instructions from the Sheriff or until 30 days have passed from the date on which I deliver this response. (See Instructions to Garnishee form.)

_____

_____

☐    I have in my possession, control or custody the following personal property (other than money) that belongs to the Debtor. I will hold all of the property for the Garnishor until I receive instructions from the Sheriff or until 30 days have passed from the date on which I deliver this response. (See Instructions to Garnishee form.)

_____

_____

☒    I may owe money to or hold property of the Debtor, but I am not sure what or how much it might be. (You must provide an explanation in the following space and you must deliver an amended response when you find out. You must deliver an amended response even if you find out that you have no property of the Debtor or owe no money to the Debtor.)

<u>Sentinel Insurance Company, Inc., is investigating coverage for claim(s) submitted by debtor.</u>

<u>Sentinel is not able to determine, at this time, whether it owes debtor any insurance proceeds.</u>

☐    (FINANCIAL INSTITUTIONS ONLY) We hold one or more accounts for the Debtor, of which $_____ is not subject to garnishment under ORS 18.784. We are forwarding all other garnishable amounts, or enough of it to satisfy the garnishment to the Garnishor.

_____

_____

☐    The writ of garnishment delivered to me, on its face, does not comply with the Oregon laws governing writs of garnishment, or I cannot determine the identity of the Debtor from the information in the writ. (You must provide an explanation in the following space.)

_____

_____

☐    I have received an order to withhold income that applies to the income of the Debtor. The order to withhold income has priority over the writ of garnishment, and compliance with the order will reduce or eliminate the money that I would otherwise deliver under the writ. (Provide details, including the name of the agency serving the order to withhold income, the date the order was served on you and the amount to be withheld. If you employ the Debtor, you must still complete Part II of this response.)

_____

_____

☐    I have received notice of a challenge to the garnishment. I will deliver to the court administrator all money that I would otherwise deliver to the Garnishor. (See Step 3 of Instructions to Garnishee form.)

☐    Other (Explain)

_____

_____

_____

### PART II: DEBTOR'S EMPLOYER
### (GARNISHEES WHO EMPLOY THE DEBTOR
### MUST FILL OUT THIS PORTION OF THE RESPONSE)

Place a check in front of all the following statements that apply. You may need to check more than one statement.

NOTE: THE LAW PROHIBITS DISCHARGE OF THE DEBTOR FROM EMPLOYMENT BY REASON OF GARNISHMENT.

☐    I EMPLOY THE Debtor. The Debtor is paid on a _____ basis (insert "weekly," "monthly" or other pay period). Wages will next be payable to the Debtor on the _____ day of _____, 2012. I will complete a Wage Exemption Calculation form for each payment of wages that is made during the 90-day period immediately following the date that the writ of garnishment was delivered to me. I will also complete a Wage Exemption Calculation form for the payday immediately following the end of the 90-day period. I will forward to the Garnishor on each of these occasions those wages calculated to be subject to garnishment, or enough of those wages to satisfy the garnishment.

☐    I had already received a writ of garnishment from another Garnishor before this writ was delivered to me. Under Oregon law, the previous writ has priority. The previous writ will terminate on the _____ day of _____, 2012.

I hereby certify that I have fully and accurately completed this garnishee response.

Dated: __January 3, 2013__ , 2012

Maloney Lauersdorf Reiner PC/Kyle A. Sturm as counsel for Sentinel Insurance Company

Name of Garnishee
(503) 245-1518
Telephone Number
(503) 245-1417
Fax Number
117 SW Taylor Street, Suite 300, Portland, OR 97204
Address
Signature



# MARION COUNTY SHERIFF'S OFFICE

MULTNOMAH COUNTY CIRCUIT COURT

| | | |
|---|---|---|
| STATE OF OREGON | ) ss. | Court Case/DA # :121114420 |
| County of Marion | ) | CSP Case # : |
| | | Sheriff's Case #: 1206317 |

*FILED 12 DEC 28 PM 1:04 CIRCUIT COURT FOR MULTNOMAH COUNTY*

## Sheriff's Return of Service

I hereby certify that I received the within WRIT OF GARNISHMENT, INSTRUCTIONS TO GARNISHEE, GARNISHEE RESPONSE, WAGE EXEMPTION CALCULATION on the 20th day of December, 2012 and delivered one copy of same at 12:45 PM on the 21st day of December, 2012, upon THE HARTFORD - SENTINEL INSURANCE COMPANY LTD at 388 STATE ST, STE 420 SALEM by delivering to DENISE WIPPER WITH CT CORPORATION SYSTEM, REGISTERED AGENT, and noted the date of delivery upon the writ. I promptly thereafter mailed a copy of the writ, challenge form and original debt calculation to the debtor if the creditor provided an address.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

*ENTERED*
*DEC 3 1 2012*

Jason Myers, Sheriff
Marion County, Oregon

By   MIKE BREWSTER
         DEPUTY

By   _____

Fee: $25.00

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH



DEC 0 4 PAID
35 PM

| | |
|---|---|
| **CEDAR LAKE HOMEOWNERS ASSOCIATION**, an Oregon domestic nonprofit corporation; and **DECATUR BRIDGEWATER VISTA CONDOMINIUMS OWNERS' ASSOCIATION**, an Oregon domestic nonprofit corporation,<br><br>        Plaintiffs,<br><br>  v.<br><br>**NORTHWEST EMPIRE COMMUNITY MANAGEMENT, INC.**, fka Professional Community Management, Inc., an Oregon corporation,<br><br>        Defendant. | Case No. 1211-14420<br><br>**WRIT OF GARNISHMENT**<br><br>**(PROVISIONAL PROCESS)** |

TO:    **The Hartford – Sentinel Insurance Company, Ltd**
        **c/o its Registered Agent CT Corporation System, 388 State Street, Suite 420, Salem, OR 97301**

      You are now a Garnishee.  AS A GARNISHEE, YOU NEED TO KNOW THE FOLLOWING: **Northwest Empire Community Management, Inc. fka Professionial Community Management, Inc., an Oregon corporation** (who is called the "Defendant") is the defendant and **Cedar Lake Homeowners' Association and Decatur Bridgewater Vista Condominium Owners' Association** (who are jointly called the "Creditors" or "Plaintiffs") are the plaintiffs in the above-captioned case.  Plaintiffs allege that defendant is indebted to them for $132,875.70, plus attorney fees and costs (the "debt").  An Order for Issuance of Provisional Process was entered against the Defendent for the debt and attorney fees in the total amount of $176,875.70 on November 21, 2012.

      The amount subject to garnishment is $176,875.70.

      This writ garnishes $176,875.70 or <u>all</u> of the following, whichever is less:

- Payments for claims submitted by or on behalf of the Defendent under policies nos. 52 SBA PV0811 SC and 52 SBA ZV5572 SC for loss of client funds.

      YOU MUST ANSWER THIS WRIT BY COMPLETING THE ATTACHED GARNISHEE RESPONSE WITHIN THE TIME ALLOWED BY LAW, WHETHER OR NOT YOU HOLD ANY OF THE DEFENDANT'S PROPERTY OR OWE ANYTHING TO THE DEFENDENT.  IF YOU DO NOT TRUTHFULLY ANSWER THIS WRIT, OR YOU DO NOT DELIVER MONEY OR PROPERTY WHEN YOU ARE REQUIRED TO DO SO, YOU WILL BE LIABLE TO THE CREDITOR.

      If you have questions, you should contact an attorney.  Court employees cannot give you legal advice.  The Creditor's attorney cannot give you legal advice.

      A writ of garnishment may be issued only by the court administrator, by the attorney for the Plaintiffs or by a person who is specifically authorized by law to issue garnishments.  This writ is issued by (check one):

X     The court administrator

The attorney for the Creditor

☐  Other authorized issuer:
    Name and title_____
    Statutory authority to issue writ_____

    This writ is valid only if it has been delivered to you within 60 days after the date of issuance.  If the court administrator is issuing this writ, the date of issuance is the date the court administrator signs the writ (see "COURT SEAL" below).  If this writ is issued by any other person, the date of issuance is the date on which the issuer signs the certification (see "CERTIFICATION" below).

## IMPORTANT ADDRESSES
### (see Step 2 of Instructions to Garnishee form)
#### (Court Administrator)

Court: Multnomah County Circuit Court
Street address: 1024 SW Fourth Avenue
City: Portland     County:    Multnomah
State: OR     Zip Code:    97204

#### (Defendent)
☒  Name:   Northwest Empire Community Management, Inc. fka Professional Community Management, Inc.
    Telephone number (if known):    503-278-3231
    Street address:  3800 NE Sandy Blvd.
    City: Portland   State: OR     Zip Code: 97232

☐  Creditor has no knowledge of Debtor's address

#### (Garnishor; check one)
☒  Creditors/Plaintiffs: (Must be filled in if the court administrator issues writ.)
    Name:   **Cedar Lakes Homeowners' Association and Decatur Bridgewater Vista Condominiums Owners' Association, c/o Landye Bennett Blumstein LLP**
    Street address: c/o 1300 SW Fifth Avenue, Suite 3500
    City: Portland    State: OR   Zip Code: 97201

☒  Attorney for Creditor:
    Name: James S. Crane – Landye Bennett Blumstein LLP
    Street address: 1300 SW Fifth Ave., Suite 3500
    City: Portland    State: OR   Zip Code: 97201
    Telephone number: (503) 224-4100    Oregon State Bar number #944938

☐  Other authorized issuer of writ:
    Name: _____
    Street address: _____
    City: _____State: _____Zip Code: _____
    Telephone number: _____

CERTIFICATION

(The following certification must be signed by the Creditor if this writ is issued by the court administrator. In all other cases, the following certification must be signed by the person issuing the writ.) I certify that I have read this writ of garnishment and to the best of my knowledge, information and belief, there is good ground to support issuance of the writ, and the amount indicated as subject to garnishment is lawfully subject to collection by this writ.

_____                    _____December 3, 2012_____
Signature          James S. Crane                    Date
                   901420
_____
Oregon State Bar No. (if attorney)                    COURT SEAL

(To be completed only if this writ is issued by the court administrator. The writ must be stamped by the court administrator. The court administrator has not calculated any amounts on the writ and is not liable for errors made in the writ by the Creditor.)

Issued by the court administrator this _____12_____ day of __December_____, 2012.

COURT ADMINISTRATOR

By_____

1

2

3          IN THE CIRCUIT COURT FOR THE STATE OF OREGON

4              FOR THE COUNTY OF MULTNOMAH

5  **CEDAR LAKE HOMEOWNERS
   ASSOCIATION**, an Oregon domestic
6  nonprofit corporation; and **DECATUR**
   **BRIDGEWATER VISTA**                    Case No. 1211-14420
7  **CONDOMINIUMS OWNERS'**
   **ASSOCIATION**, an Oregon domestic      **NOTICE PURSUANT TO ORS 18.810(5)**
8  nonprofit corporation,                   **TO BE ATTACHED TO WRIT OF**
                                            **GARNISHMENT**
9              Plaintiffs,

10     v.

11 **NORTHWEST EMPIRE**
   **COMMUNITY MANAGEMENT, INC.**,
12 fka Professional Community Management,
   Inc., an Oregon corporation,
13
               Defendant.
14

15 To:    The Hartford – Sentinel Insurance Company, Ltd
          c/o Its Registered Agent CT Corporation System, 388 State Street, Suit 420, Salem OR
16        97301

17    **Pursuant to ORS 18.810(5)**, you are hereby notified as follows:

18        Notwithstanding ORS 18.730, if a writ of garnishment is issued pursuant to an order for

19 provisional process under ORCP 83 and 84, all payments of money by the garnishee under the

20 writ shall be made to the Court Administrator for the court specified in the writ as the court with

21 authority over the writ. The Court Administrator shall hold the money pending entry of a

22 judgment against the debtor unless the court finds, upon a challenge to the garnishment made by

23 the debtor under ORS 18.700, that all or part of the money is exempt from execution or not

24 subject to garnishment. If judgment is entered in favor of the debtor, the judgment must direct

25 the Court Administrator to pay the money to the debtor. If judgment is entered in favor of the

26

Page 1 -   NOTICE PURSUANT TO ORS 18.810(5)

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224.4100
503.224.4133 (facsimile)                                    *691211.14501-002*

1    creditor, the judgment must direct the Court Administrator to pay to the creditor as much of the

2    money as will satisfy the judgment and to pay the remainder to the debtor.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Page 2 -   NOTICE PURSUANT TO ORS 18.810(5)

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224.4100
503.224.4133 (facsimile)

*691211.14501-002*





ENTERED

NOV 30 2012

IN REGISTER JK



FILED

12 NOV 29 AM 10: 17

CIRCUIT COURT
FOR MULTNOMAH COUNTY

# IN THE CIRCUIT COURT OF THE STATE OF OREGON
## FOR MULTNOMAH COUNTY

CEDAR LAKE HOMEOWNERS
ASSOCIATION, an Oregon domestic
Nonprofit corporation; and DECATUR
BRIDGEWATER VISTA CONDOMINIUMS
OWNER'S ASSOCIATION, an Oregon domestic
nonprofit corporation,
            Plaintiffs,

            vs.

NORTHWEST EMPIRE COMMUNITY
MANAGEMENT, INC., fka Professional Community
Management, Inc., an Oregon corporation,
            Defendant.

Case No 1211-14420

**SHERIFF'S RETURN OF
WRIT OF ATTACHMENT**

**No Property Located**

I HEREBY CERTIFY that I received the within Writ of Attachment on the 27th day of November 2012.

On the 27th day of November 2012 at 2:30PM, I served this Writ on Northwest Empire Community Management, Inc. by delivering same to Gregory Lloyd, the Registered Agent at 3800 NE Sandy Blvd #100, Portland, OR.

I was unable to locate the personal property described in the Instructions to Sheriff, for attachment levy.

I hereby return this Writ to the Circuit Court for the State of Oregon for Multnomah County.

DANIEL STATON,
Sheriff

By:

Marshall Ross, Senior Deputy, DPSST #1635
Civil Unit

November 28, 2012

11/27/12        12-2 ردود

1

2

3        IN THE CIRCUIT COURT FOR THE STATE OF OREGON

4        FOR THE COUNTY OF MULTNOMAH

5

6   **CEDAR LAKE HOMEOWNERS ASSOCIATION**, an Oregon domestic nonprofit corporation; and **DECATUR BRIDGEWATER VISTA CONDOMINIUMS OWNERS' ASSOCIATION**, an Oregon domestic nonprofit corporation,

Case No. 1211-14420

**WRIT OF ATTACHMENT**

7

8

9                    Plaintiffs,

10        v.

11   **NORTHWEST EMPIRE COMMUNITY MANAGEMENT, INC.**, fka Professional Community Management, Inc., an Oregon corporation,

12

13                    Defendant.

14

15   **TO THE SHERIFF OF THE COUNTY OF MULTNOMAH, GREETINGS:**

16        WHEREAS, the plaintiffs commenced this action in the Circuit Court of the State of

17   Oregon for the County of Multnomah to recover from the defendant the combined sum of

18   $132,871.60 in lawful money of the United States, plus interest at the rate of 9% per annum,

19   attorney fees, and costs of the action and the necessary affidavit and undertaking having been

20   filed as required by law,

21        WHEREAS, the court entered an Order for Issuance of Provisional Process on

22   November 21, 2012, authorizing a Writ of Attachment for insurance proceeds in the possession

23   of defendant in the amount of $132,871.60 plus $44,000 for attorney fees, a total of $176,871.60;

24        NOW, THEREFORE, IN THE NAME OF THE STATE OF OREGON, you are hereby

25   commanded and required to attach and safely keep insurance proceeds of the defendant,

26   Northwest Empire Community Management, Inc., 3800 NE Sandy Blvd., Suite 100, Portland,

Page 1 -   WRIT OF ATTACHMENT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon  97201
503.224.4100
503.224.4133 (facsimile)

*690198.14501-002*

1   Oregon 97232, within your county, not exempt from execution, or so much thereof as may be

2   sufficient to satisfy the plaintiffs' demand, namely, the sum of $176,871.60 in lawful money of

3   the United States, or in the form of a check issued by Sentinel Insurance Company and/or The

4   Hartford payable to defendant for said sum, more than said sum, or any part thereof, plus the

5   costs and expenses of this writ, and of making legal service and due return to me.

6       WITNESS my hand and seal of the circuit court, this 26th day of November, 2012.



CLERK OF THE COURT    John Fluroy

Page 2 -   WRIT OF ATTACHMENT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224-4100
503.224-4133 (facsimile)

*690198.14501-002*

COPY

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| **CEDAR LAKE HOMEOWNERS ASSOCIATION**, an Oregon domestic nonprofit corporation; and **DECATUR BRIDGEWATER VISTA CONDOMINIUMS OWNERS' ASSOCIATION**, an Oregon domestic nonprofit corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**NORTHWEST EMPIRE COMMUNITY MANAGEMENT, INC.**, fka Professional Community Management, Inc., an Oregon corporation,<br><br>Defendant. | Case No. 1211-14420<br><br>**ORDER FOR ISSUANCE OF PROVISIONAL PROCESS** |

The above matter came before this court on Plaintiffs' Petition for Provisional Process and an Order to Show Cause directed to Defendant. The hearing was held on November 21, 2012. Plaintiffs appeared by Stuart K. Cohen and James S. Crane of Landye Bennett Blumstein LLP, its lawyers, and Defendant appearing by its principal, Gregory Lloyd, and by _____, its lawyer.

IT APPEARING to the court that a complaint has been filed herein by Plaintiffs against Defendant, and that there is probable cause for sustaining the validity of the claims underlying the complaint; and

IT FURTHER APPEARING that a writ of attachment should issue with respect to the following-described property: Insurance proceeds in the amount of $132,875.70 plus $44,000 of anticipated attorney fees in the form of cash or negotiable instrument in the possession of Defendant; and

Page 1 -   ORDER FOR ISSUANCE OF PROVISIONAL PROCESS

LANDYE BENNETT BLUMSTEIN LLP<br>*Attorneys at Law*<br>1300 SW Fifth Avenue, Suite 3500<br>Portland, Oregon 97201<br>503.224.4100<br>503.224.4133 (facsimile)

*687019.13482-001*

1    IT FURTHER APPEARING that a writ of garnishment should issue with respect to the

2    above-described property in the event that a Writ of Attachment is returned without finding said

3    property;

4    IT IS HEREBY ORDERED that a writ of attachment issue directing the attachment of

5    the following-described property:  Insurance proceeds in the amount of $132,875.70 plus

6    $44,000 of anticipated attorney fees in the form of cash or negotiable instrument in the

7    possession of Defendant;

8    IT IS HEREBY FURTHER ORDERED that, should a writ of attachment directing the

9    attachment of the above-described property be returned without said property, then a writ of

10   garnishment issue directing the garnishment of the following described property:  Insurance

11   proceeds in the amount of $132,875.70 plus $44,000 of anticipated attorney fees; and

12   IT IS FURTHER ORDERED that the amount of the undertaking required by ORCP

13   82 A(3)(a) shall be $500, and that the requirements of ORCP 82 A(3)(a) shall be satisfied by the

14   maintenance of the cash bond of $500 posted by Plaintiffs on November 14, 2012, as the

15   undertaking for the issuance of a restraining order pursuant to ORCP 83 E.

16   DATED: November 2/, 2012.

17

18

19   _____
     CIRCUIT COURT JUDGE

20

21

22   Submitted by:

23

24   _____
     Stuart K. Cohen, OSB #851738
25   James S. Crane, OSB #901420
     Of Attorneys for Plaintiffs

26



CERTIFIED TO BE A TRUE COPY
OF THE ORIGINAL

Dated   11/21/12

_____
DEPUTY CIRCUIT COURT ADMINISTRATOR

Page 2 -   ORDER FOR ISSUANCE OF PROVISIONAL PROCESS

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224.4100
503.224.4133 (facsimile)

687019.13482-001

ENTERED

NOV 2 8 2012

IN REGISTER SCL

FILED

12 NOV 21 PM 4: 49

CIRCUIT COURT
FOR MULTNOMAH COUNTY

IN THE CIRCUIT COURT FOR THE STATE OF OREGON

FOR THE COUNTY OF MULTNOMAH

| | |
|---|---|
| CEDAR LAKE HOMEOWNERS ASSOCIATION, an Oregon domestic nonprofit corporation; and DECATUR BRIDGEWATER VISTA CONDOMINIUMS OWNERS' ASSOCIATION, an Oregon domestic nonprofit corporation,<br><br>        Plaintiffs,<br><br>   v.<br><br>NORTHWEST EMPIRE COMMUNITY MANAGEMENT, INC., fka Professional Community Management, Inc., an Oregon corporation,<br><br>        Defendant. | Case No. 1211-14420<br><br>**ORDER FOR ISSUANCE OF PROVISIONAL PROCESS** |

The above matter came before this court on Plaintiffs' Petition for Provisional Process and an Order to Show Cause directed to Defendant. The hearing was held on November 21, 2012. Plaintiffs appeared by Stuart K. Cohen and James S. Crane of Landye Bennett Blumstein LLP, its lawyers, and Defendant appearing by its principal, Gregory Lloyd, and by _____, its lawyer.

IT APPEARING to the court that a complaint has been filed herein by Plaintiffs against Defendant, and that there is probable cause for sustaining the validity of the claims underlying the complaint; and

IT FURTHER APPEARING that a writ of attachment should issue with respect to the following-described property: Insurance proceeds in the amount of $132,875.70 plus $44,000 of anticipated attorney fees in the form of cash or negotiable instrument in the possession of Defendant; and

Page 1 -  ORDER FOR ISSUANCE OF PROVISIONAL PROCESS

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224.4100
503.224.4133 (facsimile)

*687019.13482-001*

1       IT FURTHER APPEARING that a writ of garnishment should issue with respect to the

2   above-described property in the event that a Writ of Attachment is returned without finding said

3   property;

4       IT IS HEREBY ORDERED that a writ of attachment issue directing the attachment of

5   the following-described property:   Insurance proceeds in the amount of $132,875.70 plus

6   $44,000 of anticipated attorney fees in the form of cash or negotiable instrument in the

7   possession of Defendant;

8       IT IS HEREBY FURTHER ORDERED that, should a writ of attachment directing the

9   attachment of the above-described property be returned without said property, then a writ of

10  garnishment issue directing the garnishment of the following described property:   Insurance

11  proceeds in the amount of $132,875.70 plus $44,000 of anticipated attorney fees; and

12      IT IS FURTHER ORDERED that the amount of the undertaking required by ORCP

13  82 A(3)(a) shall be $500, and that the requirements of ORCP 82 A(3)(a) shall be satisfied by the

14  maintenance of the cash bond of $500 posted by Plaintiffs on November 14, 2012, as the

15  undertaking for the issuance of a restraining order pursuant to ORCP 83 E.

16      DATED: November 21, 2012.

17

18

19  _____
    CIRCUIT COURT JUDGE

20

21

22  Submitted by:

23

24  Stuart K. Cohen, OSB #851738
    James S. Crane, OSB #901420

25  Of Attorneys for Plaintiffs

26

Page 2 -   ORDER FOR ISSUANCE OF PROVISIONAL PROCESS

687019.13482-001

LANDYE BENNETT BLUMSTEIN LLP
Attorneys at Law
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon  97201
503.224.4100
503.224.4133 (facsimile)

IN THE CIRCUIT COURT OF THE STATE OF OREGON FOR MULTNOMAH COUNTY

| | |
|---|---|
| **CEDAR LAKE HOMEOWNERS ASSOCIATION, et al.** | Hearing Date: |
| Plaintiff/Petitioner | CASE NO: **1211-14420** |
| vs. | AFFIDAVIT OF SERVICE OF: **Civil Subpoena and Check for $35.00** |
| **NORTHWEST EMPIRE COMMUNITY MANAGEMENT, INC.,** | |
| Defendant/Respondent | |

**FILED**
12 NOV 21 AM11: 10
FOR CIRCUIT COURT
MULTNOMAH COUNTY

**ENTERED**
NOV 27 2012
IN REG. BK. _____

The undersigned, being first duly sworn, on oath deposes and says: That s(he) is now and at all times herein mentioned was a resident of the state of service, over the age of eighteen, not an officer of a plaintiff corporation, not a party to nor interested in the above entitled action, has the authority to serve pleadings in the State named below, and is competent to be a witness therein.

On the **14th day of November, 2012**, at **1:49 PM**, at the address of **3800 NE SANDY Boulevard SUITE 104, PORTLAND**, Multnomah County, **OR 97232**; this affiant served the above described documents upon **JENIFER DENNEY** by then and there personally delivering **1** true and correct copy(ies) thereof, by then presenting to and leaving the same with **JENIFER DENNEY, A brown-haired white female approx. 25-35 years of age, 5'4"-5'8" tall and weighing 120-160 lbs.**.

No Information was provided or discovered that indicates that the subjects served are members of the U.S. military.

DATED this *15* day of *Nov*, 20*12*.

*Edmund Knowles*
**Edmund Knowles, Multnomah, OR**

Service Fee Total:
**$70.00**

SUBSCRIBED AND SWORN to before me this *15* day of *NOV*, 20*12*

*Brian L Ivy*
NOTARY PUBLIC in and for the State of **Oregon**
Residing at: *Multnomah*
My Commission Expires: _____

FOR: **Landye Bennett Blumstein**
REF: **14501-002**

ORIGINAL AFFIDAVIT OF SERVICE

Tracking #: **7508024 PDX FIL**



OFFICIAL SEAL
BRIAN L IVY
NOTARY PUBLIC — OREGON
COMMISSION NO. 448216
MY COMMISSION EXPIRES MAY 18, 2014

12 NOV 27 PM 2:59

IN THE CIRCUIT COURT FOR THE STATE OF OREGON FILED

FOR THE COUNTY OF MULTNOMAH

**CEDAR LAKE HOMEOWNERS
ASSOCIATION**, an Oregon domestic
nonprofit corporation; and **DECATUR
BRIDGEWATER VISTA
CONDOMINIUMS OWNERS'
ASSOCIATION**, an Oregon domestic
nonprofit corporation,

        Plaintiffs,

v.

**NORTHWEST EMPIRE
COMMUNITY MANAGEMENT, INC.,**
fka Professional Community Management,
Inc., an Oregon corporation,

        Defendant.

Case No. 1211-14420

**WRIT OF ATTACHMENT**



ENTERED

NOV 27 2012

IN REGISTER NM

**TO THE SHERIFF OF THE COUNTY OF MULTNOMAH, GREETINGS:**

WHEREAS, the plaintiffs commenced this action in the Circuit Court of the State of Oregon for the County of Multnomah to recover from the defendant the combined sum of $132,871.60 in lawful money of the United States, plus interest at the rate of 9% per annum, attorney fees, and costs of the action and the necessary affidavit and undertaking having been filed as required by law,

WHEREAS, the court entered an Order for Issuance of Provisional Process on November 21, 2012, authorizing a Writ of Attachment for insurance proceeds in the possession of defendant in the amount of $132,871.60 plus $44,000 for attorney fees, a total of $176,871.60;

NOW, THEREFORE, IN THE NAME OF THE STATE OF OREGON, you are hereby commanded and required to attach and safely keep insurance proceeds of the defendant, Northwest Empire Community Management, Inc., 3800 NE Sandy Blvd., Suite 100, Portland,

Page 1 -   WRIT OF ATTACHMENT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224.4100
503.224.4133 (facsimile)

*690198.14501-002*

Oregon 97232, within your county, not exempt from execution, or so much thereof as may be sufficient to satisfy the plaintiffs' demand, namely, the sum of $176,871.60 in lawful money of the United States, or in the form of a check issued by Sentinel Insurance Company and/or The Hartford payable to defendant for said sum, more than said sum, or any part thereof, plus the costs and expenses of this writ, and of making legal service and due return to me.

WITNESS my hand and seal of the circuit court, this 26th day of November, 2012.



CLERK OF THE COURT            John Pluvog

Page 2 -   WRIT OF ATTACHMENT

LANDYE BENNETT BLUMSTEIN LLP
*Attorneys at Law*
1300 SW Fifth Avenue, Suite 3500
Portland, Oregon 97201
503.224-4100
503.224-4133 (facsimile)

690198.14501-002